**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Harrison P. CRONIC,
Defendant–Appellant.**

No. 88–2939.

United States Court of Appeals,
Tenth Circuit.

April 11, 1990.

John E. Green, First Asst. U.S. Atty. (William S. Price, U.S. Atty., with him on the brief), Oklahoma City, Okl., for plaintiff-appellee.

Gary Peterson, Oklahoma City, Okl., for defendant-appellant.

Before ANDERSON, TACHA, Circuit Judges, and WINDER, District Judge.*

STEPHEN H. ANDERSON, Circuit Judge.

Harrison P. Cronic appeals his conviction on eleven counts of mail fraud, 18 U.S.C. § 1341, based on charges arising out of a check kiting scheme.[1] Although couched in terms of sufficiency of the evidence, Cronic's main contention on appeal is, essentially, that an unembellished check kiting scheme is not a crime under that portion of the mail fraud statute which criminalizes schemes to obtain money by means of false or fraudulent pretenses, representations or promises. In view of *Williams v. United States*, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982) we reluctantly agree. Because the jury instructions limited the jury's consideration of the evidence to that portion of the statute, and because the government failed to prove any false pretense, representation or promise, we are obliged to reverse Cronic's conviction.

## BACKGROUND

The facts are not complicated. Cronic ran two check kiting schemes over a period of about six months in 1975.[2] The largest one covered about three and one-half months. It involved hundreds of checks, totaling millions of dollars, and, when the scheme collapsed, it left the Norman Bank of Commerce, Norman, Oklahoma, almost five hundred thousand dollars short. Cronic ran the kite between accounts of his company, Skyproof Manufacturing Co., at the Metropolitan Bank in Tampa, Florida, and the Norman Bank of Commerce. Checks in excess of Skyproof's balance were drawn on its account at the Metropolitan Bank, sent from Tampa to Norman, Oklahoma, and deposited in Skyproof's account at the Norman Bank. The process was then reversed with checks on the Skyproof account at the Norman Bank sent to Tampa for deposit in the Skyproof account at Metropolitan. The checks were made out to Skyproof itself. The transfers and deposits were worked out between a Skyproof employee in Tampa and Wylie C. Merritt, Jr., Skyproof's accountant, and an employee in Norman, Oklahoma. The actual operating income from Skyproof's business was deposited in an entirely separate bank. R.Vol. XI at 57.

The logistics were all-important to keep the kite up. Bank processing time, through a clearing house in Chicago, took three days each way. Cronic's assistant in Tampa made daily calls to the bank to ascertain Skyproof account balances.

---

* Honorable David K. Winder, United States District Court for the District of Utah, sitting by designation.

1. This is a very old case. The crime occurred fifteen years ago, in 1975. Cronic was indicted and tried in 1980, being acquitted on two counts, and convicted on eleven. That conviction was vacated by this court because of ineffective assistance of counsel, *United States v. Cronic*, 675 F.2d 1126 (10th Cir.1982), and that decision was reversed by the United States Supreme Court. *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). In April, 1988, we ordered a new trial. *United States v. Cronic*, 839 F.2d 1401 (10th Cir.1988). Cronic was retried in the Western District of Oklahoma in October, 1988, resulting in the conviction from which this appeal is taken.

2. Check kiting has been defined as follows:

"Check kiting 'occurs when accounts are maintained in different banks and checks are drawn on one account and deposited in the other when neither account has any substantial funds in it to pay the checks drawn on it. Since it takes several days to collect a check, each of the accounts will show substantial credits of uncollected checks, and those credits will continue so long as checks continue to be drawn every day in each bank and deposited in the other bank. If some checks are drawn to cash or to legitimate third parties, the checks that flow between the two banks have to be increased to maintain the "kiting" equilibrium.' "
*United States v. Pick*, 724 F.2d 297, 298 n. 1 (2d Cir.1983) (quoting *United States v. Giordano*, 489 F.2d 327, 329 (2d Cir.1973)). *See Williams v. United States*, 458 U.S. 279, 281 n. 1, 102 S.Ct. 3088, 3089 n. 1, 73 L.Ed.2d 767 (1982).

Cronic drew up and maintained a chart to keep track of checks in the processing cycle, and timed the deposit of additional checks so as to discourage detection of his scheme by either bank. His assistant in Tampa testified:

"A. Well, usually we'd call the bank in the morning and find out what the balance was. And then we would sit on the floor and decide how many checks we were going to make out, what the amounts were going to be, and we would just call Oklahoma and tell the girl in the office after we had hired her or tell [our accountant] what to put on the checks.

Q. And was there any deadline or time that you would make these deposits to cover these checks?

A. Well, we knew that every three days those checks would hit. I mean, every day we were making deposits to cover checks that were written three days earlier."

R.Vol. VIII at 211–12, R.Vol. XI at 18.

Cronic drew checks on the accounts to pay business and personal expenses, and to buy a bottling plant in Paris, Texas, among other things. During October, 1975, the Metropolitan Bank in Tampa apparently studied its records relating to the Skyproof account and concluded that the account was being used in a check kiting scheme. Metropolitan Bank thereafter dishonored all Skyproof checks drawn on that bank as drawn on uncollected funds. On October 15, 1975, at the direction of Cronic, the Metropolitan Bank closed Skyproof's accounts and subsequently transferred the remaining collected funds in those accounts to the Norman Bank of Commerce in Oklahoma. Representatives of the Norman Bank of Commerce met with Cronic and Merritt on October 12, 1975, to discuss the sizeable overdraft in his account. At that meeting, Cronic stated that he had authorized the Metropolitan Bank to transfer all collected funds to the Norman Bank of Commerce. He told the bankers that he did not know what was wrong, but assured them that his company had sufficient assets to repay any overdraft, thereby avoiding any loss to the bank. No further checks were drawn on or paid from the Norman Commerce Bank account.

On November 28, 1975, Skyproof signed a promissory note to the Norman Bank of Commerce in the amount of $484,915.76, the amount of the claimed overdraft. The bank thereafter exercised its legal remedies under the promissory note to collect the unpaid amount. Eventually, a significant portion of the unpaid balance, plus interest and attorneys' fees, was collected by judicial sale of a Skyproof subsidiary's bottling plant which resulted in a payment of $504,000 to the bank.

## DISCUSSION

■ The mail fraud statute criminalizes, among other things, "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises...." 18 U.S.C. § 1341. Although largely overlapping, a scheme to defraud, and a scheme to obtain money by means of false or fraudulent pretenses, representations, or promises, are separate offenses. *See United States v. Bonnett*, 877 F.2d 1450, 1454 (10th Cir.1989) ("The mail and wire fraud statutes make the same distinction as § 1344 between schemes to defraud and schemes to obtain property by false or fraudulent pretenses, representations, and promises."); *United States v. Rafsky*, 803 F.2d 105, 107–08 (3d Cir.1986), *cert. denied*, 480 U.S. 931, 107 S.Ct. 1568, 94 L.Ed.2d 760 (1987); *United States v. Clausen*, 792 F.2d 102 (8th Cir.), *cert. denied*, 479 U.S. 858, 107 S.Ct. 202, 93 L.Ed.2d 133 (1986); *United States v. Frankel*, 721 F.2d 917, 920–21 (3d Cir.1983); *United States v. Scott*, 701 F.2d 1340, 1343–44 (11th Cir.), *cert. denied*, 464 U.S. 856, 104 S.Ct. 175, 78 L.Ed.2d 158 (1983); *United States v. Margiotta*, 688 F.2d 108, 121 (2d Cir.1982), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *United States v. Halbert*, 640 F.2d 1000, 1007 (9th Cir.1981).

■ The offense of a scheme to defraud focuses on the intended end result, not on whether a false representation was necessary to effect the result. Schemes to defraud, therefore, may come within the scope of the statute even absent an affirm-

ative misrepresentation. *See United States v. Rafsky*, 803 F.2d at 108; *United States v. Frankel*, 721 F.2d at 921; *Kaufmann v. United States*, 282 F. 776, 779 (3d Cir.), *cert. denied*, 260 U.S. 735, 43 S.Ct. 96, 67 L.Ed. 488 (1922) ("If a scheme is devised with the intention of defrauding, and the mails are used in executing it, it makes no difference that there is not a misrepresentation of a single existing fact.").

A scheme to obtain money by means of false or fraudulent pretenses, representations, or promises, on the other hand, focuses on the *means* by which money was obtained. False or fraudulent pretenses, representations or promises are an essential element of the crime. *See United States v. Bonnett*, 877 F.2d at 1453–54.

The indictment against Cronic charged both a scheme to defraud *and* a scheme to obtain money by false or fraudulent pretenses, representations or promises. Cronic concedes that point. Brief of Appellant at 15. In part, the indictment charged that Cronic—

> "devised and intended to devise a scheme and artifice to defraud and to obtain money from banks in Oklahoma and Florida by inducing said banks in the names of 'Skyproof Manufacturing, Inc.' and Wylie C. Merritt, Jr., to pay out substantial sums of cash, furnish deposit credits and to obligate the said banks to pay out cash or furnish deposit credits for a series of insufficient funds checks.... The scheme and artifice ... was also to obtain money by means of the following false and fraudulent pretenses, representations and promises ...: That by the continuous issuance of insufficient funds checks on Skyproof Manufacturing, Inc., and Wylie C. Merritt, Jr., or by 'floating' the series of insufficient funds checks between the said banks, they thereby created false or inflated balances in the various bank accounts of Skyproof Manufacturing, Inc., ... well knowing at the time of issuance that there were not sufficient funds on deposit to cover said checks."

R.Vol. I, Tab 11/1/88 at 6–7.

■ If the jury instructions had been consistent with the indictment, permitting the jury to return a verdict of guilty on the scheme to defraud charge, a challenge to that verdict would have been easier to deal with on appeal. Generally speaking, and assuming the existence of other elements such as intent, check kiting constitutes a scheme to defraud under the mail fraud statute, as well as the wire and bank fraud statutes, 18 U.S.C. §§ 1343, 1344, which contain almost identical language. *See United States v. Bonnett*, 877 F.2d at 1455 ("Courts have agreed that a check kiting scheme constitutes a scheme to defraud under the first clause of the statutes, if the mails or interstate wires are employed."); *United States v. Rafsky*, 803 F.2d at 108; *United States v. Pick*, 724 F.2d 297 (2d Cir.1983); *United States v. Cooper*, 596 F.2d 327 (8th Cir.1979); *see also United States v. Frankel*, 721 F.2d at 920–21.

■ The problem in this case stems from the fact that the government allowed the jury to be instructed only as to the offense of obtaining money by means of false or fraudulent pretenses or representations. Instructions 9 and 11 provided, in part:

### "INSTRUCTION NO. 9

### ESSENTIAL ELEMENTS

IN ORDER FOR THE DEFENDANT TO BE FOUND GUILTY OF MAIL FRAUD IN VIOLATION OF SECTION 1341 OF TITLE 17 OF THE UNITED STATES CODE, THE GOVERNMENT MUST PROVE FOUR THINGS BEYOND A REASONABLE DOUBT:

FIRST, THE DEFENDANT MADE UP A PLAN OR SCHEME TO OBTAIN MONEY OR PROPERTY BY FALSE PROMISES OR STATEMENT;

SECOND, THE DEFENDANT KNEW THAT THE PROMISES OR STATEMENTS WERE FALSE WHEN THEY WERE MADE;

THIRD, THE DEFENDANT KNOWINGLY CAUSED MAIL TO BE DELIVERED ACCORDING TO THE DIRECTION THEREON, TO CARRY OUT THE PLAN OR SCHEME; AND

FOURTH, THE DEFENDANT ACTED WITH THE INTENTION OF OBTAINING MONEY OR PROPERTY BY FALSE STATEMENTS OR PROMISES."

R.Vol. I, Tab 11/1/88 at 26.

**"INSTRUCTIONS NO. 11**

**DEFINITIONS**

THE WORDS 'SCHEME' AND 'ARTIFICE' MEAN ANY PLAN OR COURSE OF ACTION DESIGNED TO DECEIVE OTHERS, AND BY FALSE OR FRAUDULENT PRETENSES, REPRESENTATIONS OR PROMISES, TO OBTAIN MONEY OR PROPERTY FROM ANY PERSON SO DECEIVED.

. . . .

A 'SCHEME TO DEFRAUD' MEANS SOME PLAN TO PROCURE MONEY OR PROPERTY BY MEANS OF FALSE PRETENSES OR REPRESENTATIONS CALCULATED TO DECEIVE PERSONS OF ORDINARY PRUDENCE.

... THE GOVERNMENT MUST PROVE ... THAT THE DEFENDANT PARTICIPATED IN THE SCHEME, AND MADE STATEMENTS OR CAUSED STATEMENTS TO BE MADE, WHICH WERE FALSE AND KNOWN BY DEFENDANT TO BE FALSE WITH THE INTENT TO DEFRAUD."

*Id.* at 28.

Thus, the government saddled itself with the burden of establishing that money was obtained from these banks *by means of* false and fraudulent *pretenses, representations, or promises.*[3]

In *Williams v. United States,* 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), the Supreme Court held that the deposit of a check backed by insufficient funds did not constitute a false statement. "[T]ech-nically speaking, a check is not a factual statement at all, and therefore cannot be characterized as 'true' or 'false'. . . . Each check did not, in terms, make any representation as to the state of petitioner's bank balance." *Id.* at 284–85, 102 S.Ct. at 3091–92. Although *Williams* involved 18 U.S.C. § 1014, which makes it a crime to knowingly make a false statement to a financial institution, its reasoning has been extended to the mail, wire, bank fraud and other statutes. *See United States v. Bonnett,* 877 F.2d at 1454–57; *United States v. Kucik,* 844 F.2d 493, 498–500 (7th Cir.1988); *United States v. Rafsky,* 803 F.2d at 108; *United States v. Frankel,* 721 F.2d at 919.

We expressly referred to *Williams* in our decision relating to the earlier proceedings in this case. *United States v. Cronic,* 839 F.2d 1401, 1403 (10th Cir.1988). We also stated in *Bonnett:*

"The common thread running through *Williams* and its progeny is that a criminally prohibited statement or representation cannot be formed from an implied representation that the maker of a check will have sufficient funds to pay the check upon presentment. We therefore conclude that, under *Williams,* if a check can form the basis of a representation, it may not do so based upon any implied representation concerning the sufficiency of the maker's bank account to pay the check upon presentment."

*United States v. Bonnett,* 877 F.2d at 1456.[4]

Cronic contends that since a single check does not constitute a misrepresentation, a series of insufficient funds checks cannot be a misrepresentation either. That is, any multiple of zero is still zero. *See Williams v. United States,* 458 U.S. at 284, 102 S.Ct. at 3091 ("that *course of conduct* did not involve the making of a 'false statement' ")

---

3. The government offered no alternative instructions concerning the elements of the crime, and it did not object to the instructions actually given in that respect. These instructions are therefore the law of this case, and the evidence must conform to them to support the conviction. *See United States v. Killip,* 819 F.2d 1542, 1548 (10th Cir.), *cert. denied,* 484 U.S. 865, 108 S.Ct. 186, 98 L.Ed.2d 139 (1987).

4. As we discussed in *Bonnett,* the general bank fraud statute, 18 U.S.C. § 1344, was enacted in 1984 in response to *Williams. United States v. Bonnett,* 877 F.2d at 1454. *See United States v. Kucik,* 844 F.2d at 498–99.

(emphasis added). Thus, Cronic argues that as a matter of law under *Williams*, mere evidence of an unembellished check kiting operation cannot support a conviction for a scheme to obtain money by false representations. In further support of that argument Cronic cites *United States v. Frankel*, 721 F.2d at 919, and *United States v. Kucik*, 844 F.2d at 498–500. We are compelled to agree.

If no representation is made by passing a bad check, either as to the state of the maker's bank balance or otherwise, *Williams v. United States, United States v. Bonnett*, nothing is left in the bare check kite itself which *can* be a misrepresentation, absent other acts or communication.

The only specific misrepresentation identified in the indictment in this case was the "continuous issuance of insufficient funds checks" creating "false or inflated balances in the various bank accounts...." R.Vol. I, Tab 11/1/88, at pp. 6–7. However, the government cites no authority, and we have discovered none, which supports the proposition that bank balances in a check kiting scheme constitute misrepresentations, or that the timing and orchestration of entries in those balances constitutes a misrepresentation.

The act of depositing a check does not automatically create unrestricted credit in the depositor's account. It creates only an accounting entry *for* an uncollected check. The depositary bank has no obligation except to present the check for collection without unexcused delay. Okla.Stat.Ann. tit. 12(A) § 4–213(4)(a). ("[C]redit given by a bank for an item in an account with its customer becomes available for withdrawal as of right ... in any case where the bank has received a provisional settlement for the item ... when such settlement becomes final...."); H. Bailey, *Brady on Bank Checks*, ¶ 20.6 (6th ed. 1987) ("In other words, it is not wrongful dishonor to return a check drawn against uncollected funds.").

If a bank *chooses* to honor checks written against uncollected funds, it is making a conscious business decision to permit an overdraft in the account. *See Brady on Bank Checks*, at ¶ 18.1 ("If the bank pays the checks presented against the account before the checks deposited are collected, the result is an overdraft; but a bank is not required to honor checks that exceed the current collected balance in the depositor's account.").

Thus, in its essentials a bare check kiting scheme works not because of representations (applying the *Williams* rationale to the checks themselves), but because of the banks' predisposition to allow their customers to continuously overdraw their accounts pending receipt of uncollected funds. *See* B. Clark, *The Law of Bank Deposits, Collections and Credit Cards*, ¶ 2.4[1] (Rev. ed. 1981) ("In their wildest dreams the drafters of [UCC] Article 4 probably never suspected how pervasive overdraft banking, as authorized by Section 4–401(1), would become.... The allowance of overdrafts ... has become a way of life...."). In the process, account balances in the respective banks accurately reflect exactly what is going on by way of deposits, collected and uncollected funds, and payments out of or against the accounts.

In short, under the authority of *Williams*, supported by *Bonnett, Frankel* and *Kucik*, a bare check kiting scheme, unembellished by other acts or communications, does not violate the false or fraudulent pretenses, representations, or promises clause of the mail fraud statute.

As we have noted, there is nothing in Cronic's case which embellishes the scheme which he successfully worked against these banks. No separate or additional representation was charged or proved at trial.[5]

---

5. The only evidence offered at trial relating to communication between Cronic and the Norman Bank of Commerce, other than the checking transactions themselves, concerned a meeting between Cronic and bank officials on October 12, 1975—*after* the Metropolitan account had been closed and the overdraft at the Norman Bank of Commerce discovered. During this meeting, Cronic was asked about the overdraft at the Norman bank. Cronic stated that something was wrong, that he did not know what it was, and that he suspected some kind of

Thus, this case is distinguished from *United States v. Bonnett*, 877 F.2d 1450 (10th Cir.1989), and other cases in which separate representations induced the banks to permit overdrafts in the subject accounts. Absent any proof of misrepresentation, the government has failed to meet its burden of proving the elements of the crime beyond a reasonable doubt. *See United States v. Shunk*, 881 F.2d 917, 921 (10th Cir.1989); *United States v. Hooks*, 780 F.2d 1526, 1531 (10th Cir.), *cert. denied*, 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986).[6]

## CONCLUSION

Because the jury instructions limited the permissible grounds for conviction to proof of a "plan or scheme to obtain money or property by false promises or statements," the evidence produced at trial, which proves only an unembellished check kiting scheme, does not support the conviction. Our holding that the evidence was legally insufficient renders a retrial upon these charges impermissible under the Fifth Amendment's Double Jeopardy Clause. *Burks v. United States*, 437 U.S. 1, 18, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978). The trial court's judgment is therefore RE-VERSED and Cronic's conviction is VACATED.

unspecified accounting error had occurred. He asserted that his company had sufficient "paid assets" to cover any overdraft so that no one would suffer any loss. Contrary to the specific allegation in the indictment, the government offered no substantive proof that Cronic misrepresented the balance of Skyproof's account in the Metropolitan Bank to the Norman Bank of Commerce representatives. Nothing about the November 12 meeting, which took place after the entire check kiting scheme had effectively ended, in any way facilitated Cronic's check kiting operation. Cronic was not able to obtain any additional bank funds from any bank as a result of this meeting, nor could any of his statements be construed as an effort to do so. Cronic clearly indicated his intention to begin restitution of the overdrawn funds, and produced for the Norman Bank officials the November 10 authorization directing the Metropolitan Bank to forward all collected funds to the bank in Norman. Indeed, the only real outcome of this meeting was to enable bank officials to begin recovering its uncollected funds. Any statements made by Cronic at the meeting, even if they were false, could not have been part of a "plan or scheme to obtain money or property" as alleged in the indictment and described in the jury instruction. The scheme described in the indictment had already terminated as of the date of that meeting.

6. In rejecting Cronic's argument concerning the sufficiency of the evidence, the district court relied almost exclusively on the fact that this court had previously affirmed a conviction of a bank officer engaged in check kiting activity under an entirely different statute. *United States v. McKinney*, 822 F.2d 946 (10th Cir. 1987). The court reasoned that, considering the "total picture" and the "substance of the transaction" involved in a check kiting scheme as we instructed the court to do in *McKinney*, Cronic's scheme was patently offensive under the mail fraud statute and no further analysis was necessary. Just as with a "scheme or artifice to defraud" under the first clause of the mail fraud statute, the essential elements of the crime in *McKinney* did not require proof of any misrepresentation or false pretense.