54 F.3d 788
NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Craig R. FRANKE, Defendant-Appellant.
 Nos. 94-3062[1], 94-3063.
(D.C. Nos. 92-CR-20069-01, 92-CR-20029-01).
 United States Court of Appeals, Tenth Circuit.
 May 16, 1995.
 
 ORDER AND JUDGMENT[2]
 Before ANDERSON, ALDISERT[3] and HOLLOWAY, Circuit Judges.
 
 HOLLOWAY
 
 1
 Craig R. Franke was indicted on 15 counts of mail fraud in the District of Kansas under 18 U.S.C. 1341. Three counts were dismissed by the government prior to trial. A trial date of August 31, 1992, was set by the court. Mr. Franke, who had been released on bond, failed to appear for trial. He was arrested approximately nine months later in San Antonio, Texas, and returned to Kansas for trial. After a jury trial, Franke was convicted on four counts of mail fraud, Counts 11 through 14, and acquitted on the remaining eight mail fraud counts. Immediately after the mail fraud case went to the jury, Franke was tried and convicted on the charge of failure to appear at the August 1992 trial under 18 U.S.C. 3146(a)(1). Franke now appeals his convictions and sentence on the mail fraud charges (No. 94-3063), and his conviction for failure to appear for trial (No. 94-3062). We have jurisdiction under 28 U.S.C. 1291.
 
 
 2
 * During the relevant time period in 1988 and 1989, Franke engaged in the business of locating persons who might, unbeknownst to them, have claims for money or property. Franke's convictions arose from his actions in two transactions which involved monies held by the States of Kansas and Illinois. Both States maintain what may be referred to as unclaimed funds. When a state-issued check is either returned in the mail or uncashed for some length of time, records of the transaction are maintained and the funds are accounted for as unclaimed. In one of the transactions which form the basis of the charges involved in this case, Franke had obtained information from Illinois regarding potential claims against these funds belonging to Commonwealth Edison Company. In the second transaction, Franke had learned that records of the State of Kansas indicated that monies were owing to the Department of Labor of the State of Louisiana.
 
 A.
 
 3
 Counts 11 through 13 focused on Franke's actions in connection with the potential claims of Commonwealth Edison for funds held by the State of Illinois. In August 1988, Mr. George Rifakes received a letter at his home from defendant. The letter indicated that it was from International Heir Locators (IHL), a name used by Franke, and stated that IHL
 
 
 4
 is an organization that provides a service of locating missing heirs or the like entitled to collect unclaimed and/or abandoned funds. In the past we have recovered funds through dormant bank accounts, insurance proceeds, wills and estates, plus many other financial recoveries.
 
 
 5
 The purpose of this letter is to bring to your attention our belief of funds you are known to be entitled to collect ....
 
 
 6
 Government Ex. 17, Supp. Vol. II at 102-03 (emphasis added). The letter also indicated that Rifakes would be contacted by Franke, the signator, or "another company representative."
 
 
 7
 Subsequently, Franke met Rifakes at his office in Chicago, where Rifakes was employed as a vice-president of Commonwealth Edison Company. Rifakes inquired as to the nature of the "funds" purportedly owing to him. Franke refused to give any details, explaining that the nature of his business required him to proceed in this manner, or else his prospective clients would directly apply for the funds and he would be unable to collect his fee. Franke presented to Rifakes a proposed contract, which Rifakes accepted and signed after making some minor handwritten modifications. The opening recital of the agreement states:
 
 
 8
 International Heir Locators, hereinafter referred to as to as [sic] I.H.L., has reason to believe that I, George P. Rifakes the undersigned, have an interest in a certain asset, and desire to have and obtain the information from I.H.L.
 
 
 9
 Government Ex. 54, Supp. Vol. V, doc. 54; Def. Ex. 426, Supp. Vol. V, doc. 426 (emphasis added). The agreement provided for IHL to receive one-half of any collected funds as payment for its services. It also provided that IHL was appointed as attorney-in-fact for Rifakes and authorized IHL to "effect settlement" in his name.
 
 
 10
 Prior to meeting with Rifakes, Franke had learned through public records that the State of Illinois was holding some $197,000 which had been previously authorized in two separate payments to Commonwealth Edison but which had never been paid. After Rifakes had executed the agreement with IHL, Franke wrote to the Illinois State Comptroller's office and requested payment of the sums owing to Commonwealth Edison. Franke signed the letter in his own name as "representative" of Pre-Audit Reports.[4] The letter requested that payment be sent to Commonwealth Edison, care of George Rifakes, at an Overland Park, Kansas address where Franke received mail. The letter also indicated that copies were being sent to Rifakes and to a law firm, but the evidence indicated that neither party actually received a copy of this letter.
 
 
 11
 In response to Franke's letter, the Illinois Comptroller's office wrote back informing Franke that an affidavit would be required to complete the requested payment. The letter referred to only one of the two requested payments in the amount of $93,000. (The other claim, having been made more than three years since issuance of the original check could only be pursued through the Illinois Court of Claims under Illinois law.)
 
 
 12
 In response to that letter, Franke sent a completed affidavit along with a transmittal letter which once again requested payment to be made to Commonwealth Edison and sent in care of Rifakes to the Kansas address and which once again indicated, inaccurately, that Rifakes and a law firm were being sent copies of the letter. The affidavit enclosed with this letter was signed by Franke in his own name and by Franke for Rifakes. Rifakes knew nothing about the submission of this claim. Rifakes was not authorized to contract with Franke on behalf of Commonwealth Edison and testified that he did not intend to do so. Rifakes had no idea that Franke would attempt to use the contract to claim funds owing to Commonwealth Edison.
 
 
 13
 After receiving the affidavit, the Illinois Comptroller's office issued a warrant payable to "Commonwealth Edison, co George P. Rifakes VP" and mailed the warrant to Franke's address in Overland Park. Franke deposited the check in his IHL account. Rifakes testified that to his knowledge Commonwealth Edison never received any of the proceeds.
 
 B.
 
 14
 The transaction underlying Count 14 was quite similar. Franke contacted Leo Hamilton, an attorney who at the time was Assistant Secretary for the Louisiana Department of Labor. As in the transaction with Rifakes, Franke first contacted Hamilton by letter and then met with Hamilton in his office. Hamilton signed a contract essentially the same as that signed by Rifakes and received the same explanation for Franke's refusal to answer questions about the source of the funds to be claimed. Hamilton had no contact with Franke following the meeting and execution of the contract.
 
 
 15
 Franke had learned that the Kansas State Treasurer's office had issued a warrant to the Louisiana Department of Labor that had remained unpaid. After Hamilton signed the IHL contract, Franke sent a letter to the Treasurer's office seeking issuance of a replacement warrant. Because a replacement warrant had previously been issued, Franke's efforts were unsuccessful. Hamilton, like Rifakes, testified that he had no authority to commit his employer to a contract such as the one he signed with IHL, nor did he have any intention of doing so.
 
 
 16
 Significantly, both Rifakes and Hamilton testified that they believed from Franke's presentation that some assets or monies were to be claimed on their individual behalf; both testified that they lacked authority to commit their employer to such an agreement and that they did not intend to do so.
 
 II
 
 17
 We will first address Mr. Franke's appeal in No. 94-3062, in which he challenges his conviction for failure to appear. There Franke raises only one issue, the admission of testimony which he argues was in violation of the attorney-client privilege.
 
 
 18
 At trial the government introduced the testimony of Carl Cornwell, an attorney who had formerly represented Franke on the mail fraud charges. Cornwell testified that two previous trial settings in the mail fraud case had been continued on his application due to conflicts with Cornwell's other trial settings in unrelated matters. Most significantly, Cornwell testified that he informed Franke that trial was scheduled for August 31, that Franke had requested that Cornwell again attempt to obtain a continuance, and that Cornwell had advised Franke that he would not seek another continuance because, in his opinion, there were no valid grounds for seeking further delay.
 
 
 19
 The only issue raised in this appeal is Franke's contention that his objection to Cornwell's testimony should have been sustained based on the attorney-client privilege. Acknowledging that precedent in this circuit holds that communications regarding the time and place of trial are not confidential and therefore not within the attorney-client privilege, United States v. Bourassa, 411 F.2d 69, 74 (10th Cir.), cert. denied, 396 U.S. 915 (1969), Franke argues that in the instant circumstances the privilege should nonetheless apply under what has been termed the "last-link" doctrine, citing In re Grand Jury Proceedings (Pavlick ), 680 F.2d 1026 (5th Cir.1982) (en banc), inter alia. According to Franke, the last-link doctrine is an exception to the rule that an attorney may be required to disclose client information that is not confidential in nature and so not protected by the attorney-client privilege. Franke asserts that this exception applies "in exceptional circumstances in which disclosure would reveal information as tantamount to a confidential professional communication." Aplt.'s Brief at 7-8 (citing Tornay v. United States, 840 F.2d 1424, 1426 (9th Cir.1988)).
 
 
 20
 We discussed the last-link doctrine in In re Grand Jury Subpoenas (Anderson ), 906 F.2d 1485, 1489-92 (10th Cir.1990). We noted there that the circuits have split on whether to recognize this theory (which has evolved primarily in cases concerning whether such information as a client's identity or the source of payment of attorney fees should be protected) and that there is some disagreement within at least one circuit as to the fundamental precepts of the doctrine. We declined in that case to decide whether to recognize the doctrine, finding that the facts of the case would not support application of the last-link exception in any event. Id. at 1490-91.
 
 
 21
 Similarly, we find that the last-link exception would not apply here to shield from disclosure the facts to which the attorney testified. We thus need not decide whether this circuit should adopt this doctrine. As we discussed in Anderson, there is considerable variance in the reported cases with respect to the breadth of the last-link exception. In its broadest formulation, the doctrine may protect otherwise nonprivileged communications, such as the identity of a client, when disclosure "would yield substantially probative links in an existing chain of inculpatory events...." Anderson, 906 F.2d at 1489 (quoting In re Grand Jury Proceedings (Jones ), 517 F.2d 666, 674 (5th Cir 1975)). In Anderson, we further said that a number of courts have formulated a narrower statement of the exception, a view that we noted with approval. Under this approach, the evidence in question must not only provide links to an existing chain of inculpatory evidence, but must in effect disclose protected confidential communications, a requirement that has led to this being called the "confidential communication" exception. Id. at 1491. We further said:
 
 
 22
 We hold that in order to invoke the attorney client privilege ... in this Circuit, the advice ... must have concerned the case then under investigation and disclosure of the client's identity would now be, in substance, the disclosure of a confidential communication by the client, such as establishing the identity of the client as the perpetrator of the alleged crime at issue.
 
 
 23
 Id. at 1492.
 
 
 24
 Franke's contention in the instant case invokes this narrower formulation, the confidential communication exception. The facts, however, do not support application of this principle to the testimony at issue. Franke argues that disclosure of the lawyer's communication regarding the time of trial and the lawyer's rejection of Franke's request to seek another continuance was in substance a disclosure of confidential communications, namely the existence of a dispute between Franke and his attorney regarding the attorney's preparedness and the "proper tactical method to employ regarding scheduling." Aplt.'s Brief at 9. We do not agree that the attorney's testimony can be equated with disclosure of confidential communications. All that was material to the offense charged was the attorney's testimony that the time of trial had been communicated to Franke and that Franke had been advised that no continuance would be requested. These communications were not privileged. Bourassa, 411 F.2d at 74.
 
 
 25
 In his brief, Franke argues that the communications in this case between himself and his attorney concerned a proper tactical method to employ regarding scheduling; that this contention by Franke appears justified because the attorney had not prepared an exhibit list or a witness list for use in the mail fraud case; and that this communication therefore became inextricably linked with the presentation of that case. Aplt.'s Brief at 9. We do not agree. As stated above, the fact that the attorney advised Franke of the trial date and that another continuance would not be sought is within the exception from the attorney-client privilege. Bourassa, 411 F.2d at 74. Insofar as the testimony revealed disagreement between Franke and his attorney, that disclosure was harmless error, if error at all, because the disagreement was wholly irrelevant to the failure to appear charge. Disclosure of the allegedly confidential information did not "yield substantially probative links in an existing chain of inculpatory evidence...." Anderson, 906 F.2d at 1489.
 
 
 26
 In sum, we are unpersuaded by any of Franke's arguments that there was reversible error in the trial on the failure to appear for trial charge.
 
 III
 
 27
 In No. 94-3063, Franke appeals both his conviction and his sentence on the mail fraud charges. We consider first Franke's argument that the district court committed error in denying his requests to proceed with "hybrid" representation and his alternative request to proceed pro se. We find no such error.
 
 
 28
 Franke made his requests on the second day of trial, after the jury had been selected and just prior to opening statements and the presentation of evidence. Franke first asked "for a hybrid form of representation...." When that request was denied, he informed the trial judge that he would like to proceed pro se, invoking Faretta v. California, 422 U.S. 806 (1975), and the Sixth Amendment. The trial court denied that request also.
 
 A.
 
 29
 Franke first contends that the denial of his request for hybrid representation requires reversal. Acknowledging that we have previously held that there is no right to hybrid representation, see United States v. Treff, 924 F.2d 975, 979 n. 6 (10th Cir.), cert. denied, 500 U.S. 958 (1991), Franke argues that the district judge failed to exercise his discretion in ruling on this request and in the alternative that the judge abused his discretion.
 
 
 30
 Franke's contention that the court failed to exercise discretion is based on one comment made by the judge in response to the request for hybrid representation. The court's initial response included the comment that "[t]here is no such thing [as hybrid representation]." Supp. Vol. II at 2.[5] Franke asserts that this indicates an erroneous view of the law which led to denial of his motion without the exercise of discretion. We think this argument reads too much into the single remark. We note that the government responded during the argument on the hybrid and pro se requests by citing the district judge's previous opinion in United States v. Stiner, 765 F.Supp. 663, 665 (D. Kan.1991), aff'd, 952 F.2d 1401 (10th Cir.1992) (table). In Stiner, the same trial judge noted that in United States v. Hill, 526 F.2d 1019, 1024-25 (10th Cir.1975), cert. denied, 425 U.S. 940 (1976), this court had held "the Constitution does not guarantee a defendant the right to 'hybrid representation,' that is the assistance of co-counsel in the presentation of his or her case." We think it clear that the judge correctly understood the governing law and did exercise discretion in denying the motion for hybrid representation.
 
 
 31
 Franke asserts several grounds to support his alternative argument that the district judge abused his discretion in denying the motion for hybrid representation. He first contends that he had demonstrated familiarity with legal concepts and terms in a motion to dismiss the indictment which he had personally prepared and filed before trial. I R., doc. 61. This contention is unpersuasive. The basic reason for rejecting hybrid representation was the trial judge's concern about the awkwardness of having Franke and his attorney in charge at different points in the proceedings. See Appendix A at 2. Franke goes on to assert that the district judge did not balance his Sixth Amendment right to represent himself with the potential impact on the efficient administration of justice and that the judge did not even let him explain what kind of hybrid representation he was requesting. We think the record shows to the contrary. Most importantly, we hold that no abuse of discretion occurred in view of the belatedness of Franke's request. The discussion infra regarding the untimeliness of the request to proceed pro se is applicable also to this issue.
 
 
 32
 In short, we find no abuse of discretion in the denial of hybrid representation. Accordingly we turn to the contention that Franke was erroneously denied his right of self-representation.
 
 B.
 
 33
 It is, of course, well established that a defendant has a constitutional as well as a statutory right to defend herself or himself in federal criminal proceedings. See Faretta v. California, 422 U.S. 806, 836 (1975); 28 U.S.C. 1654. Problems arise for the trial judge when the accused says he wishes to proceed pro se. The First Circuit has observed:
 
 
 34
 A trial court's evaluation of an individual's desire to represent himself is fraught with the possibility of error. Because self-representation necessarily entails the waiver of the sixth amendment right to counsel, a trial court can commit reversible constitutional error by either improperly granting a request to proceed pro se--and thereby depriving the individual of his right to counsel--or by denying a proper assertion of the right to represent oneself, and thereby violating Faretta.
 
 
 35
 Cross v. United States, 893 F.2d 1287, 1290 (11th Cir.), cert. denied, 498 U.S. 849 (1990). For this and other reasons, we have held and reaffirmed that a request to defend oneself must be clearly and unequivocally made, and that consequent waiver of the right to counsel must be made knowingly and intelligently. United States v. Reddeck, 22 F.3d 1504, 1510 (10th Cir.1994); United States v. Treff, 924 F.2d at 978; United States v. Bennett, 539 F.2d 45, 50 (10th Cir.), cert. denied, 429 U.S. 925 (1976).
 
 
 36
 The government contends that Franke never made an unequivocal statement of his desire to proceed pro se. Although the statements of the defendant do lend some support to the government's argument (see the transcript of the discussion in the Appendix to this opinion), we find that the defendant did make a sufficiently clear and unequivocal request to proceed pro se after the district court had rejected his first preference, which was for hybrid representation. Therefore, in deciding this issue we do not rely on the asserted lack of an unequivocal request to proceed pro se.
 
 
 37
 We feel the untimeliness of the request is the controlling factor. The district court here denied the motion, stating: "I'm not going to permit you to proceed pro se at this stage of the case." Supp. Vol. II at 2. After further argument by Franke, the judge explained:
 
 
 38
 Well, Mr. Franke, I think that your constitutional rights are very closely intertwined with an orderly administration of justice. And certainly that orderly administration of justice involves your being represented by counsel at this trial. And once we have started the trial with counsel, I'm just simply not going to permit you--I think it would be highly prejudicial to you for you to proceed at this stage without counsel. And I'm not going to permit a hybrid representation and I am not going to permit you to proceed pro se.
 
 
 39
 Supp. Vol. II at 4 (emphasis added). Thus, it is clear that the defendant's motion was denied on the basis that it was not timely made.
 
 
 40
 We find no error in the district court's ruling.[6] The constitutional right of self-representation, like other constitutional rights, may be waived. In one of our first opinions following Faretta, we held that a defendant had waived the right to represent himself by failing to assert the right clearly until six days before the scheduled trial. United States v. Bennett, 539 F.2d 45, 50-51 (10th Cir.1976). More recently, we have had several appeals in which a defendant waived his right to counsel and elected to proceed pro se, only to change his mind and request assistance of counsel during trial. In these cases the defendants have asserted errors in the denial of the right to counsel when the trial judge refused to permit the requested change. We have held that such a request is in effect a request for substitution of counsel, which is within the district court's sound discretion. We explained that
 
 
 41
 [o]nce the defendant has elected either to waive appointed counsel or waive the constitutional right to defend himself, he does not have an unlimited right to thereafter change his mind and seek the other path of representation.
 
 
 42
 United States v. Reddeck, 22 F.3d 1504, 1510-11 (10th Cir.1994); see also United States v. Merchant, 992 F.2d 1091, 1095 (10th Cir.1993); United States v. Willie, 941 F.2d 1384, 1391 (10th Cir.1991), cert. denied, 502 U.S. 1106 (1992).
 
 
 43
 We find no abuse of discretion here in the denial of Franke's request to proceed pro se after trial proceedings had begun. In Merchant, we said that "[i]t is within the discretion of the court to deny as untimely requests for counsel made after meaningful trial proceedings have begun." 992 F.2d at 1095 (quoting United States v. Tolliver, 937 F.2d 1183, 1187 (7th Cir.), cert. denied, 502 U.S. 919 (1991)). We think that the same principle should apply to requests to proceed pro se after meaningful trial proceedings have begun. One reason for this is that a request to proceed pro se requires the trial judge to make on the record a "thorough and comprehensive examination of all the facts and circumstances" to ensure that the waiver of the right to counsel is knowing and intelligent. United States v. Padilla, 819 F.2d 952, 957 10th Cir.1987). The potential for disruption in conducting such an examination after trial has begun is obvious.
 
 
 44
 We note that other circuits have held that a request to proceed pro se may be denied as untimely when made after meaningful trial proceedings have begun. E.g., United States v. Betancourt-Arretuche, 933 F.2d 89, 95-96 (1st Cir.), cert. denied, --- U.S. ---- (1991) (collecting cases); see also Cross v. United States, 893 F.2d at 1291 n. 10. We agree that jury selection constitutes a "meaningful trial proceeding" and hold that denial of Franke's request after selection of the jury was not an abuse of the district court's discretion.
 
 
 45
 We find no merit in Franke's contention that he had given prior notice of his desire to represent himself by the filing of a motion to dismiss the indictment, mentioned supra, which he apparently prepared himself. I R., doc. 61. That motion, although signed only by Franke and perhaps prepared without assistance of counsel, both at the beginning and at the end names counsel, giving no hint--much less an unequivocal expression--of any desire to proceed at trial without counsel. Even if counsel's name had not been included on the document, the filing of a pro se motion to dismiss the indictment in and of itself could not have been taken as a knowing and voluntary waiver of the crucial right to assistance of counsel at trial and election to proceed pro se.
 
 
 46
 In sum, we find no reversible error in the denial of Franke's motions for hybrid or pro se representation.
 
 IV
 
 47
 Defendant contends that the district court abused its discretion in admitting evidence of flight. The evidence complained of came in the testimony of two witnesses. Carl Cornwell, as noted supra, had been retained by Franke to represent him in defense of the mail fraud charges. Cornwell testified that he had received a notice from the court setting the trial for August 31, 1992, and that he had informed Franke of this by letter of August 14, 1992, and orally. Supp. Vol. I at 18, 22. Cornwell appeared for trial on that date, but Franke did not appear. Id. at 26. Cornwell had no further contact with Franke until June 1993. Id. at 28. Cornwell testified that Franke had requested that he file for a continuance of the August 31 trial date, believing the case was not ready for trial. Id. at 30, 36. The week before trial Cornwell met with Franke to prepare for trial; there was discussion of the August 31 trial date; Franke said he wanted to continue the trial; Cornwell told Franke that Cornwell felt he had no legal reason to do that and that he was going to decline to file a motion. Id. at 24-25. (Two previous continuances had been granted by the court because Cornwell had other obligations to try older cases.)
 
 
 48
 Probation officer Weidel testified that Franke had been informed of the conditions on which he had been released prior to the scheduled 1992 trial. These conditions included a promise to appear for all proceedings, a prohibition on out-of-state travel unless prior permission was obtained, and a requirement to notify the court, defense counsel and the United States Attorney of any change of residence. Supp. Vol. I at 41-42. Weidel last had contact with Franke in August 1992, after which he had no contact from Franke until after his arrest in San Antonio. Franke had not requested permission to travel except once to St. Louis, which Franke later said he would not do. Id. at 44.
 
 
 49
 Franke testified on his own behalf. He said that based on his conversation with Mr. Cornwell and the two prior continuances, it was his belief that his case would be continued in his absence on August 31, 1992. Supp. Vol. I at 66.
 
 
 50
 Franke maintains that "the alleged flight evidence in this case is not relevant" and "was not probative of any relevant issue," citing United States v. Foutz, 540 F.2d 733, 740 (4th Cir.1976) ("inference that one who flees from the law is motivated by consciousness of guilt is weak at best...."). Aplt.'s Brief at 22. He also maintains that to the extent it is relevant, its probative force is greatly outweighed by its prejudicial impact. Id. We disagree. We thoroughly discussed flight evidence in United States v. Martinez, 681 F.2d 1248, 1256-59 (10th Cir.1982) (per curiam). As we noted in a later case, "[i]t is sufficient to say here that such evidence 'carries with it a strong presumption of admissibility,' and that a trial court's decision to admit such evidence will not be reversed absent an abuse of discretion." United States v. Lepanto, 817 F.2d 1463, 1467 (10th Cir.1987) (quoting Martinez ).
 
 
 51
 Although guilt is not a necessary inference from defendant's failure to appear for trial and his unexplained, unauthorized travel to Texas, it is a permissible circumstantial element of proof. Moreover, in light of its permissible use, it was not an abuse of discretion to view its probative value as not outweighed by its prejudicial effect. We find no abuse of discretion in admitting this evidence.
 
 V
 
 52
 We next consider Franke's contention that the evidence was insufficient to establish the elements of mail fraud on any of the four counts of conviction. In assessing this argument we must consider the evidence in the light most favorable to the government since it prevailed in the jury trial.
 
 
 53
 Initially, Franke correctly asserts that the mail fraud statute, 18 U.S.C. 1341, encompasses two separate offenses, schemes to defraud and schemes to obtain money or property by means of false or fraudulent pretenses, representations, or promises, as we noted in United States v. Cronic, 900 F.2d 1511, 1513-14 (10th Cir.1990). Franke further relies on our observation in Cronic that an affirmative misrepresentation is not an element of a scheme to defraud under the mail fraud statute, id., but that false or fraudulent pretenses, representations or promises are an essential element of the separate offense of scheming to obtain money and property by means of false and fraudulent pretenses and representations that the indictment charged against Franke in Counts 11 through 14, with which we are concerned. Defendant is on solid ground thus far.
 
 
 54
 Franke then urges that "there were no false or fraudulent pretenses involved in the four counts upon which convictions were had." Aplt.'s Brief at 27. Accordingly, he argues that the convictions must be reversed. Id. at 34. We disagree. We note first that Franke was charged in Counts 11 through 14 with having devised a scheme for obtaining money and property "by means of false and fraudulent pretenses and representations." I R., doc. 1 at 1. The jury was so instructed. Instruction Nos. 8 and 13, Supp. Vol. IV, doc. 86. We find that misrepresentations clearly were made. The primary misrepresentations fall into two categories--misrepresentations to Rifakes and Hamilton that the contractual authority they granted to Franke would be used to pursue recovery of monies due them personally, and misrepresentations to the state agencies that Franke was authorized to make claims for Commonwealth Edison and the State of Louisiana.
 
 
 55
 Franke contends that he never actually represented to Rifakes or Hamilton that monies were due them personally. We find this contention strains credulity. It is abundantly clear from the evidence that Franke sought to and did induce Rifakes and Hamilton to believe that monies were to be sought on their behalf. Rifakes, Supp. Vol. II at 103; Hamilton, Supp. Vol. II at 27-29. No mention was made in either instance of their employers. Both testified that they had no authority to authorize Franke to make collections for their employers, and that they did not do so.[7] We have held on several occasions that fraudulent representations within the meaning of the statute may consist of "deceitful statements of half-truths or the concealment of material facts...." United States v. Allen, 554 F.2d 398, 410 (10th Cir.), cert. denied, 434 U.S. 836 (1977); accord United States v. Curtis, 537 F.2d 1091, 1097 (10th Cir.), cert. denied, 429 U.S. 962 (1976); Williams v. United States, 368 F.2d 972, 975 (10th Cir.1966), cert. denied, 386 U.S. 997 (1967); and Gusow v. United States, 347 F.2d 755, 756 (10th Cir.) ("the deception need not be premised upon the verbalized words alone. The arrangement of the words, or the circumstances in which they are used may convey the false and deceptive appearance."), cert. denied, 382 U.S. 906 (1965).[8]
 
 
 56
 In sum, we are satisfied that the evidence was sufficient to support the convictions of the defendant.
 
 VI
 
 57
 Finally, Franke alleges that the district court erred in sentencing him to pay restitution in the amount of $93,102.23 and a fine in the amount of $20,000 on the mail fraud convictions. The first error claimed in the imposition of these penalties is the absence of proof of defendant's ability to pay. In reviewing an order of restitution, we accept the district court's findings of fact unless clearly erroneous, and we will not disturb an order of restitution absent an abuse of discretion. United States v. Rogat, 924 F.2d 983, 984-85 (10th Cir.), cert. denied, 499 U.S. 982 (1991). It is the defendant's burden to show his financial resources and needs, and those of his dependents. Id. at 985.
 
 
 58
 With these standards in mind, we find no clearly erroneous findings of fact and no abuse of discretion. The evidence before the sentencing court consisted solely of the Presentence Investigation Report ("PSR") by the Probation Office. The PSR stated that Franke had no ascertainable assets. As to income, however, the PSR stated, based on an interview with Franke, that he had earned net income of over $12,000 per month in his IHL business. Based on this evidence, we cannot say that the district court's finding that Franke may have the ability to pay the restitution during the three-year period of supervised release is clearly erroneous.
 
 
 59
 Similarly, we find no abuse of discretion in the imposition of the fine of $20,000. Franke argues that the trial court did not make a specific finding that the imposition of a fine would not impair his ability to make restitution, citing 18 U.S.C. 3572(b). Although the court made no express finding, it is evident that the court did consider whether the fine would impair the ability to pay restitution. The fine imposed is less than half the maximum of $50,000 that could have been ordered. Because the district court considered the evidence available, chiefly the uncontested income figure provided by Franke himself, we find no abuse of discretion in the imposition of the fine.
 
 
 60
 AFFIRMED.
 
 APPENDIX A
 
 61
 Supp. Vol. II, pages 2-8, Jury Trial Proceedings, December 14, 1993, in No. 92-20029-01, District of Kansas
 
 
 62
 (the following proceedings were had outside the presence of the jury with all parties present:)
 
 
 63
 THE COURT: Mr. Regan, I'm informed you had something you wanted to take up.
 
 
 64
 MR. REGAN: Yes, I appreciate the Court's accommodation. I would like to address the Court with regard to some procedural matters.
 
 
 65
 THE COURT: Yes, Mr. Franke.
 
 
 66
 THE DEFENDANT: Judge, I have discussed it with my attorney and what we would like today to do is move for a hybrid form of representation where--
 
 
 67
 THE COURT: All right. I understand. There is no such thing. And so if you're--if what you're suggesting is that you do some of the trial work and he do some of it, that won't be permitted.
 
 
 68
 THE DEFENDANT: In that case, I would ask, Judge, that I move for a pro se motion.
 
 
 69
 THE COURT: Well, that won't be permitted either. I'm not going to permit you to proceed pro se at this stage of the case. You have very competent counsel and he can represent you and I don't believe that any useful purpose would be served by permitting you to proceed pro se at this time. I'm not going to do that, Mr. Franke.
 
 
 70
 THE DEFENDANT: Judge, I would cite Feretta versus California under the Sixth Amendment on a pro se motion. And the reason I do so is because I don't believe that anyone knows the case quite as well as I do myself. And I think that goes without saying. I don't necessarily want to go pro se and I would prefer to work with my attorney during trial, but if I'm offered no other choice, then that would be my choice.
 
 
 71
 THE COURT: Do you have any response to this, Mr. Shernuk?
 
 
 72
 MR. SHERNUK: Yes, Judge. Judge, the Court's well aware of the fact that there is no right to hybrid representation. As a matter of fact, the case before this Court, United States versus Stiner, 765 Fed.Supp. 663, this Court held exactly that, which was affirmed by the Tenth Circuit. There's also a case, although it's somewhat dictum, from the Eleventh Circuit, it's Cross V United States, 893 1279 at page 1291, footnote 10, which specifically held in a situation similar to this the defendant's request to proceed pro se on the first day of trial right before opening statements was untimely and the request to go pro se was properly denied.
 
 
 73
 There are other cases, Judge, along the same line. We think the Court's decision is well supported by the facts and should deny his request to proceed pro se.
 
 
 74
 THE DEFENDANT: Judge?
 
 
 75
 THE COURT: Yes?
 
 
 76
 THE DEFENDANT: May I?
 
 
 77
 THE COURT: Go ahead.
 
 
 78
 THE DEFENDANT: He mentioned notice of the Court on pro se. Actually notice given to the Court on or about October 17th on a motion to dismiss. That motion was filed pro se based on that motion. It should serve as basis for notice of a pro se representation or give way to grounds for a hybrid form of representation.
 
 
 79
 THE COURT: Well, Mr. Franke, I think that your constitutional rights are very closely intertwined with an orderly administration of justice. And certainly that orderly administration of justice involves your being represented by counsel at this trial. And once we have started the trial with counsel, I'm just simply not going to permit you--I think it would be highly prejudicial to you for you to proceed at this stage without counsel. And I'm not going to permit a hybrid representation and I am not going to permit you to proceed pro se. I'm not going to relieve Mr. Regan of his responsibilities.
 
 
 80
 THE DEFENDANT: Judge, I would have to almost insist on a Sixth Amendment right.
 
 
 81
 THE COURT: Well, I believe I just ruled, Mr. Franke. So you may have a seat.
 
 
 82
 THE DEFENDANT: Judge--
 
 
 83
 THE COURT: That's it.
 
 
 84
 THE DEFENDANT: I don't believe it's--the trial should go forth.
 
 
 85
 THE COURT: Well, it's going forward. I have just given you my ruling and so you will proceed with Mr. Regan's assistance.
 
 
 86
 THE DEFENDANT: Judge, what you're saying is--
 
 
 87
 THE COURT: I have ruled. Now that's it. Please be seated.
 
 
 88
 THE DEFENDANT: Judge, I would like to talk to you in--
 
 
 89
 THE COURT: No. You may be seated now. I've given you my ruling.
 
 
 90
 THE DEFENDANT: Judge, I refuse to work with Mr. Kevin Regan.
 
 
 91
 THE COURT: Well, be seated. We're going to proceed with Mr. Regan. We're not going to do this in the middle of trial.
 
 
 92
 THE DEFENDANT: Judge, we've actually started this before trial has started and there was--
 
 
 93
 THE COURT: Mr. Franke, I told you that I have ruled now. That's it.
 
 
 94
 THE DEFENDANT: Judge, I respect you for your opinion--
 
 
 95
 THE COURT: It's not my opinion, it's my ruling. So you'll be seated now or I'll have the marshal seat you.
 
 
 96
 THE DEFENDANT: Judge, I don't believe this trial will be in orderly fashion once the jury reaches the presence of the courtroom. And I don't have any intentions nor do I necessarily feel obliged to dismiss Mr. Regan as my counsel, but I would like to exercise my constitutional right under the Sixth Amendment and Feretta versus California rule.
 
 
 97
 During the trial Kevin and I have discussed certain--well, certain segments of it where he may cross-examine a witness, give an opening statement, and perhaps a witness may come up that I might like to cross-examine so I may be able to face my accusers. And I don't believe that there's any conflict between Kevin and I in that arrangement at all. And I request, if it pleases the Court, that we have an opportunity to proceed in this manner.
 
 
 98
 THE COURT: All right. Have a seat.
 
 
 99
 THE DEFENDANT: Thank you, Judge.
 
 
 100
 THE COURT: Thank you. But that will not be permitted. Mr. Franke, you will not be permitted to cross-examine witnesses. You can consult with Mr. Regan and he will do, I'm sure, what you ask him to do.
 
 
 101
 Is that jury here yet? All right. We'll bring in the jury.
 
 
 102
 THE DEFENDANT: Judge, may we approach the bench?
 
 
 103
 THE COURT: No.
 
 
 104
 MR. REGAN: Your Honor, before counsel for the Government begins his opening statement, with counsel, may we take a matter up outside the hearing of the jury--
 
 
 105
 THE COURT: Wait just a moment then.
 
 
 106
 (Whereupon, the jury returned to the courtroom and the following proceedings were had with all parties being present:)
 
 
 107
 MR. REGAN: My client has asked me to put a matter into the record. And my client has asked me to move to withdraw from this case and at his request, I make that motion orally.
 
 
 108
 THE COURT: All right. Well, your motion is denied. I'm not going to permit you to withdraw. Now I believe we're ready for the jury.
 
 
 109
 (Whereupon, the jury returned to the courtroom and the following proceedings were had in open court with all parties being present:)
 
 
 
 [1]
 After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument in Case No. 94-3062. See Fed. R.App. P. 34(f), 10th Cir. R. 34.1.9. That case is therefore ordered submitted without oral argument. No. 94-3063 was argued by counsel to this panel
 
 
 [2]
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470
 
 
 [3]
 Honorable Ruggero J. Aldisert, Senior Circuit Judge of the Third Circuit, sitting by designation
 
 
 [4]
 Pre-Audit Reports was another name used by Franke; the address shown for Pre-Audit Reports was the same as that used by Franke for IHL
 
 
 [5]
 The entire discussion on the issues of hybrid and pro se representation is reproduced in Appendix A to this opinion
 
 
 [6]
 The Supreme Court has made it clear that the denial of a request to proceed pro se, after a knowing and voluntary waiver of the right to counsel, is not subject to harmless error review. See McKaskle v. Wiggins, 465 U.S. 168, 177 n. 8 (1984)
 
 
 [7]
 Rifakes, Supp. Vol. II at 108-10; Hamilton, Supp. Vol. II at 27-29
 
 
 [8]
 We realize that in some of the cases cited the court did not draw the distinction made in Cronic between schemes to defraud and schemes to obtain money or property by means of false or fraudulent pretenses, representations, or promises. But, as we also noted in Cronic, the two separate offenses are "largely overlapping." 900 F.2d at 1513. We are convinced that the statements in these cases--that half-truths and concealments may constitute fraudulent representations--are fully applicable to the offense of devising a scheme for obtaining money or property by false or fraudulent pretenses, representations, or promises under 18 U.S.C. 1341