**UNITED STATES COURT OF APPEALS**
**Tenth Circuit**
**Byron White United States Courthouse**
**1823 Stout Street**
**Denver, Colorado 80294**
**(303) 844-3157**

Patrick J. Fisher, Jr.                                                          Elisabeth A. Shumaker
Clerk                                                                              Chief Deputy Clerk

January 23, 1998


**TO:**  ALL RECIPIENTS OF THE CAPTIONED OPINION

**RE:**  97-3045, *United States v. Trammell*
          January 12, 1998


Please be advised of the following correction to the opinion:

On page 5, in the first sentence of the last paragraph that begins "On January 18, 1996, Trammell was indicted . . ." there is a typographical error. The name of the former Assistant United States Attorney referenced in the sentence should not read "Robert Schodorf." The correct name is "Richard Schodorf."

Please make the appropriate correction to your copy of the opinion.

Very truly yours,

Patrick Fisher, Clerk


Keith Nelson
Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 12 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

No. 97-3045

MICHAEL W. TRAMMELL,

Defendant-Appellant.

Appeal from United States District Court
for the District of Kansas
(D.C. No. 96-CR-10010)

Steven K. Gradert, Assistant Federal Public Defender (David J. Phillips, Federal
Public Defender, with him on the brief), Wichita, Kansas, for the appellant.

Stephen K. Lester, Assistant United States Attorney (Jackie N. Williams, United
States Attorney, and Richard L. Schodorf, Assistant United States Attorney, with
him on the brief), Wichita, Kansas, for the appellee.

Before TACHA, McKAY, and BRISCOE, Circuit Judges.

BRISCOE, Circuit Judge.

Michael W. Trammell appeals his convictions for two counts of mail fraud, in violation of 18 U.S.C. § 1341, one count of wire fraud, in violation of 18 U.S.C. § 1343, and two counts of money laundering, in violation of 18 U.S.C. § 1957. He also challenges the district court's enhancement of his sentence for abusing a position of trust pursuant to U.S.S.G. § 3B1.3. We exercise jurisdiction under 28 U.S.C. § 1291, and affirm his convictions and his sentence.

## I.

This case involves Trammell's misappropriation of investors' funds. Trammell, a licensed insurance agent who operated under the corporate name of Senior Insurance Strategies, Inc., solicited funds from investors under the guise of selling annuities issued by American Investors Life Insurance Company, Inc., and Financial Benefit Life Insurance Company. In reality, Trammell used all but $100,000 of the funds for unrelated personal and business expenses. His contract with American Investors required that he instruct investors to make checks payable directly to the insurance company instead of to the agent or the agent's company. American Investors terminated its contract with Trammell on February 7, 1991, because he failed to follow this policy. Trammell then entered into an agent agreement with Financial Benefit on March 6, 1991. This agreement also required that Trammell instruct investors to make checks payable directly to the company.

On December 14, 1990, Leslie Oberhelman gave Trammell three checks payable to Senior Insurance Strategies, totaling $200,000, for American Investors annuities. Trammell forwarded Oberhelman's completed annuity applications to American Investors, but did not include the associated $200,000 premium. American Investors wrote to Trammell on three occasions asking him to forward the funds so that the annuity applications could be processed. Finally, on January 30, 1991, American Investors wrote a letter to Oberhelman's daughter, the proposed annuitant, informing her premiums had not been received and the company was closing its file.

On March 19, 1991, after his termination from American Investors, Trammell sent two annuity applications for Oberhelman to Financial Benefit. On March 29, Larry Sawyer, an employee of Senior Insurance Strategies, sent two applications to Oberhelman's daughter for her signature. Sawyer told Oberhelman that $150,000 of Oberhelman's money was being used to purchase annuities from Financial Benefit, when in fact, as the government's financial analyst demonstrated at trial, Trammell had spent all of Oberhelman's money by February 5, 1991. Trammell eventually purchased a $100,000 annuity for Oberhelman from Financial Benefit by wiring money from another investor's account. American Investors later settled a civil lawsuit with Oberhelman for $100,000.

On February 15, 1991, Carl and Dixie McWhorter gave Trammell a check for $17,325, and on April 8, 1991, they gave him an additional check for $32,514.50. Trammell told the McWhorters to make the checks payable to Senior Insurance Strategies. These checks were to be used to purchase a $60,000 annuity. Sawyer wrote to the McWhorters' daughter on April 9, 1991, asking for additional information and that she sign the annuity application. Trammell forwarded the completed application to Financial Benefit, but sent no money. In fact, as the government's financial analyst demonstrated at trial, Trammell had spent nearly all of the funds from the first check by February 28, 1991, and nearly all of the funds from the second check by May 1, 1991. The McWhorters never received an annuity and settled a civil lawsuit with Financial Benefit for $30,000.

Marcella Storey gave Trammell a check for $139,661.42 on June 3, 1991, to purchase an annuity from Financial Benefit. Trammell deposited the check in a Lawrence, Kansas, bank and, on June 7, 1991, he wired $100,000 of the funds to Financial Benefit for Oberhelman's annuity. Trammell forwarded an application for a $118,918.84 annuity to Financial Benefit for Storey, but did not send the required premium. The government's financial analyst demonstrated at trial that Trammell had spent all of Storey's money by June 17, 1991. In July, Storey received a $22,500 annuity issued by Presidential Life Insurance Company. Storey filed a civil lawsuit against Trammell, Senior Insurance Strategies, and

Financial Benefit and settled with Financial Benefit for $58,000.

Trammell was indicted in Kansas state court on December 6, 1991, for three counts of failing to pay insurance premiums by an insurance agent, in violation of Kan. Stat. Ann. § 40-247. Joseph Kisner, supervised by Richard Schodorf, prosecuted the case for the state. On March 25, 1992, after a jury was impaneled and an opening statement was presented by the prosecutor, the district court granted Trammell's motion for judgment of acquittal based on an ambiguity in the statute. Specifically, the court found § 40-247, which punishes an insurance agent for failing to pay a premium after negotiating or renewing a "contract of insurance," does not cover an agent who fails to pay a premium after negotiating or renewing a contract for an *annuity*. The state appealed under Kan. Stat. Ann. § 22-3602(b)(1) and (3), and the Kansas Supreme Court limited the appeal to a question reserved under § 22-3602(b)(3). While the appeal was pending, the Kansas legislature amended Kan. Stat. Ann. § 40-247 to include contracts for annuities. After the legislature amended the statute, the court dismissed the appeal pursuant to State v. Hodges, 734 P.2d 1161 (Kan. 1987), as the court's answer to the reserved question was no longer of statewide interest or vital to uniform administration of the criminal law.

On January 18, 1996, Trammell was indicted in federal court and Richard Schodorf, then an Assistant United States Attorney, represented the government.

Trammell was convicted of two counts of mail fraud, one count of wire fraud, and two counts of money laundering. He was sentenced to forty-one months' imprisonment and three years' supervised release. In addition, he was ordered to pay $282,661.42 in restitution.

## II.

Trammell argues his convictions should be reversed because (1) his federal prosecution violated the Double Jeopardy Clause; (2) his due process rights were violated by preindictment delay; (3) there was insufficient evidence to sustain his convictions for mail fraud and wire fraud; (4) there was insufficient evidence to establish federal jurisdiction over the money laundering charges; and (5) the district court failed to use a special verdict form. In addition, Trammell argues his sentence should not have been enhanced pursuant to U.S.S.G. § 3B1.3 for abuse of a position of trust.

### Double Jeopardy

Trammell contends his federal prosecution was barred by the Double Jeopardy Clause because he was previously prosecuted and acquitted in state court. A defendant bears the burden of proving double jeopardy. United States v. Rodriguez-Aguirre, 73 F.3d 1023, 1025 (10th Cir. 1996). This court reviews a district court's factual findings underlying a double jeopardy claim for clear error. Id. at 1024-25. However, we review de novo the court's legal determination

regarding double jeopardy.  Id. at 1025.

The Double Jeopardy Clause of the Fifth Amendment states "no person . . . shall . . . be subject to the same offense to be twice put in jeopardy of life or limb."  U.S. Const. amend. V  It is well established that "prosecutions undertaken by separate sovereign governments, no matter how similar they may be in character, do not raise the specter of double jeopardy as that constitutional doctrine is commonly understood."  United States v. Guzman, 85 F.3d 823, 826 (1st Cir.), cert. denied, 117 S. Ct. 537 (1996).  The dual sovereignty doctrine rests upon the notion that "laws of separate sovereigns are indeed separate and that one act may violate the laws of each; accordingly, prosecution by each cannot be for the same offense."  United States v. Raymer, 941 F.2d 1031, 1037 (10th Cir. 1991).

Despite the general dual sovereignty rule, there is a limited exception commonly referred to as the "sham prosecution" exception.  See Bartkus v. Illinois, 359 U.S. 121, 123-24 (1959).  In Bartkus, the court rejected a double jeopardy claim, noting:

> [The record did] not support the claim that the State of Illinois in bringing its prosecution was merely a tool of the federal authorities, who thereby avoided the prohibition of the Fifth Amendment against a retrial of a federal prosecution after an acquittal.  [The record also] does not sustain a conclusion that the state prosecution was a sham and a cover for a federal prosecution, and thereby in essential fact another federal prosecution.

Id. The implication from this statement is that when one sovereign is acting as "merely a tool" of the other, and the second prosecution is merely a "sham and cover" for a previously unsuccessful prosecution, the second prosecution violates the Double Jeopardy Clause. Although frequently noted, this exception is "an extremely narrow one" and is rarely applied. United States v. Paiz, 905 F.2d 1014, 1024 (7th Cir. 1990); see also United States v. Rector, 111 F.3d 503, 507 (7th Cir. 1997) (noting the exception "has been discussed by courts in the process of rejecting its application ever since [it was created]"); Guzman, 85 F.3d at 827 ("[Bartkus exception] limited to situations in which one sovereign so thoroughly dominates or manipulates the prosecutorial machinery of another that the latter retains little or no volition in its own proceedings").

The "sham prosecution" exception has been discussed by this court but has never been applied to grant a defendant relief. See Raymer, 941 F.2d at 1036-38. In fact, since its articulation in 1959, the exception has been applied in only one reported federal case, see United States v. Belcher, 762 F.Supp. 666, 670-71 (W.D. Va. 1991), which has led some courts to question its continued validity. See Raymer, 941 F.2d at 1037 ("possible exception to the dual sovereignty rule might exist"); Paiz, 905 F.2d at 1024 (doubting existence of "very narrow" exception and explaining court has "uniformly rejected" its use).

A defendant attempting to persuade a court to apply the "sham prosecution"

exception faces the "substantial burden of proving one sovereign is so dominated by the actions of the other that the former is not acting of its own volition." Raymer, 941 F.2d at 1037. This burden is not satisfied by merely showing the state has conducted the majority of the investigation relied upon by the government in federal prosecution of the defendant. See United States v. Bernhardt, 831 F.2d 181, 183 (9th Cir. 1987) ("[S]ufficient independent federal involvement . . . save[s] the prosecutions from th[e] exception."); see also United States v. Johnson, 973 F. Supp. 1102, 1108 (D. Neb. 1997) ("It is perfectly permissible for federal authorities to prosecute cases investigated almost exclusively by state officers."). It is also irrelevant that a state prosecutor, after unsuccessfully prosecuting a defendant, encourages or requests federal authorities to prosecute the defendant. See United States v. Tirrell, 120 F.3d 670, 677 (7th Cir. 1997) ("state merely requested the United States to prosecute Mr. Tirrell a second time"). Moreover, a defendant is not entitled to application of the exception simply because the same attorney represented both the state and the United States in the two prosecutions against the defendant. See Raymer, 941 F.2d at 1038; United States v. Padilla, 589 F.2d 481, 484-85 (10th Cir. 1978); see also United States v. Pena, 910 F. Supp. 535, 540 (D. Kan. 1995) ("Every circuit to date that has considered this issue has held that the cross-designation of a state district attorney as a federal attorney to assist or even to conduct a federal

prosecution does not by itself bring the case within the Bartkus exception."). At least one court has held this to be true even when the state prosecutor later served as a specially appointed Assistant United States Attorney for the express purpose of prosecuting defendant a second time and was compensated by the state to prosecute defendant in federal court. See Bernhardt, 831 F.2d at 183.

Trammell has not satisfied his substantial burden to fall within the very limited "sham prosecution" exception. At most, Trammell has demonstrated Schodorf, the Assistant United States Attorney who prosecuted his federal case, also supervised the attorney who prosecuted his state case. However, Schodorf testified he was not directly involved in the state prosecution and was not even familiar with the state prosecution until after Trammell was acquitted. Specifically, he stated the state prosecution of Trammel "was [Kisner's] case and I paid no attention to it." R. Suppl. I at 56. Moreover, he submitted an affidavit explaining the only reason he prosecuted the federal case was that it was reassigned to him after another Assistant United States Attorney resigned. Based on this testimony, the court found "Schodorf acted as the nominal supervisor of the attorney who brought the previous state criminal charges, but that he was not significantly involved in either the decision to bring those charges or the handling of the case." R. I, doc. 39 at 4. This finding is not clearly erroneous. Schodorf's tangential involvement does not demonstrate the federal government was so

dominated by the actions of the state that the federal government was "not acting of its own volition." See Raymer, 941 F.2d at 1038. Contrary to Trammell's characterization, the government has established it conducted substantial independent investigation into Trammell's activities. An agent for Internal Revenue Service performed an extensive analysis and examination of Trammell's financial and banking records, and this analysis was presented to the jury as an exhibit.

Finally, Trammell makes much of the fact that the witnesses and evidence used in the state prosecution were the same witnesses and evidence used in the federal prosecution. Even if this is true, it simply does not demonstrate the federal prosecution was a sham. The witnesses and exhibits that are key to the prosecution will not change merely because the prosecution moves from state to federal court. Further, numerous individuals who were not included on the state witness list testified during the federal trial.

Trammell has clearly not sustained his heavy burden of proving the government was so dominated by the actions of the state that it was "not acting of its own volition." Trammell's federal prosecution did not violate the Double Jeopardy Clause.

**Due Process**

Trammell contends his due process rights were violated by the

government's three year and nine month delay in indicting him after he was acquitted in state court. Whether Trammell's due process rights were denied by a delay in bringing an indictment is a question of fact, which this court reviews for clear error. See United States v. Engstrom, 965 F.2d 836, 838 (10th Cir. 1992).

"[T]he Due Process Clause has a limited role to play in protecting against oppressive [pre-indictment] delay." United States v. Lovasco, 431 U.S. 783, 789 (1977). "Preindictment delay is not a violation of the Due Process Clause unless the defendant shows both that the delay caused actual prejudice and that the government delayed purposefully in order to gain a tactical advantage." United States v. Johnson, 120 F.3d 1107, 1110 (10th Cir. 1997). Vague and conclusory allegations of prejudice resulting from the passage of time and the absence of witnesses are insufficient to constitute a showing of actual prejudice. Defendant must show definite and not speculative prejudice, and in what specific manner missing witnesses would have aided the defense. United States v. Jenkins, 701 F.2d 850, 855 (10th Cir. 1983).

Trammell argues the government's delay prejudiced his case because two of his victims died before testifying at his federal trial and because he testified during an intervening civil suit without exercising his rights under the Fifth Amendment. He does not specifically allege how the witnesses' testimony would have been of benefit to his case. Further, there is no indication in the record that

the government actually used his deposition testimony from the civil suit in his federal prosecution.

Trammell has completely failed to establish the government's failure to indict him sooner was an intentional ploy to gain a tactical advantage. Schodorf testified the delay was because of a backlog of cases and a shortage of attorneys in his office. He testified that cases are often filed near the end of the applicable statute of limitations period. Schodorf testified the government's own presentation in the case suffered from the death of the witnesses. In denying Trammell's motion to dismiss, the district court explained the inability to call the two victims as witnesses would not be a significant disadvantage to Trammell, and there was "no indication that the delay was undertaken with the purpose of working injury to the ability of Trammell to defend the action." R. I, doc. 39 at 3. This finding is not clearly erroneous.

**Sufficiency of Evidence to Support Mail and Wire Fraud Convictions**

Trammell contends the evidence was not sufficient to support his convictions for mail and wire fraud. Specifically, he argues (1) the government presented no evidence that he devised or intended to devise a scheme to defraud; (2) there was no proof he used the mails or caused the mails to be used; and (3) the government failed to prove the mailings were in execution of the fraudulent scheme.

In reviewing a challenge to sufficiency of the evidence, we must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. In answering this question, we may neither weigh conflicting evidence nor consider the credibility of witnesses." United States v. Pappert, 112 F.3d 1073, 1077 (10th Cir. 1997) (citations omitted). This court must consider the evidence and all reasonable inferences in a light most favorable to the government. See United States v. Reddeck, 22 F.3d 1504, 1507 (10th Cir. 1994).

*Scheme to defraud*

To prove mail fraud under 18 U.S.C. § 1341, the government must establish (1) a scheme or artifice to defraud or obtain money by false pretenses, representations, or promises; and (2) use of the mails to execute the scheme. To prove wire fraud under 18 U.S.C. § 1343, the government must establish (1) a scheme or artifice to defraud or obtain money by false pretenses, representations, or promise; and (2) use of interstate wire communications to facilitate the scheme. A scheme to defraud is conduct intended to or reasonably calculated to deceive ordinary people. Reddeck, 22 F.3d at 1507. Evidence of the "schemer's indifference to the truth of statements can amount to [evidence of] fraudulent intent." Id.

The jury was instructed that a "scheme to defraud" means "any deliberate plan of action or course of conduct by which someone intends to deceive or cheat another or by which someone intends to deprive another of something of value." R. I, doc. 62, instr. 15. Under this definition, it is clear the government presented sufficient evidence for the jury to conclude Trammell created a "scheme to defraud." See, e.g., Reddeck, 22 F.3d at 1506-08 (sufficient evidence of defendant's scheme to defraud despite claim actions were result of delusional disorder).

Trammell signed brokerage agreements with American Investors and Financial Benefit that required him to collect premiums from investors made payable only to the companies. Unfortunately, apparently to obtain personal access to investors' funds, Trammell instructed investors to make their checks payable to Senior Insurance Strategies instead of to the companies. Sawyer testified that Trammell instructed him to have investors make their checks payable to Senior Insurance Strategies. All of the investors involved here made their checks payable to Senior Insurance Strategies, and the government presented an extensive analysis of how Trammell systematically spent the investors' money for unrelated business and personal expenses. With the exception of one annuity purchased for Oberhelman, none of the money given to Trammell by the investors was used to purchase annuities. A jury could easily conclude Trammell created a

deliberate plan of action or course of conduct to deceive or cheat another or deprive another of something of value.

*Use of mails*

The record also reflects the government presented ample evidence that Trammell caused the mails to be used in the execution of his scheme to defraud. Oberhelman's daughter testified she received a letter from Trammell and she sent a letter back to Trammell through the postal system. The McWhorters' daughter testified that she received a letter from Trammell through the mail. Sawyer testified that he "sent" both letters at the direction of Trammell. A jury could easily conclude Trammell caused the mails to be used.

Trammell argues the letters sent to Oberhelman's daughter and the McWhorters' daughter did not further his alleged scheme because he had already obtained money from Oberhelman and the McWhorters when the letters were sent. The letters in question requested the recipient to complete the enclosed form, sign the form, and return it to Senior Insurance Strategies. "In a mail fraud case it is not necessary that the mailing predate the defendant's receipt of the money." United States v. Kelley, 929 F.2d 582, 585 (10th Cir. 1991). Mailings sent after the defendant has obtained the victim's money are considered "in furtherance of the scheme" for purposes of 18 U.S.C. § 1341 if they facilitate concealment of the

scheme. Id. These mailings are commonly referred to as "lulling letters." See

United States v. Massey, 48 F.3d 1560, 1566 (10th Cir. 1995) ("Lulling letters

can further a fraudulent scheme for the purposes of the mail fraud statute."). The

Supreme Court has defined a "lulling letter" as a mailing that is "designed to lull

the victims into a false sense of security, postpone their ultimate complaint to the

authorities, and therefore make the apprehension of the defendant[] less likely

than if no mailings had taken place." United States v. Maze, 414 U.S. 395, 403

(1974). "To be part of the execution of the fraud . . . the use of the mails need

not be an essential element of the scheme. It is sufficient for the mailing to be

'incident to an essential part of the scheme' or a 'step in the plot.'" Schmuck v.

United States, 489 U.S. 705, 710-11 (1989) (citations omitted) (quoting Badders

v. United States, 240 U.S. 391, 394 (1916)).

The letters here were obviously designed to lull Oberhelman and the

McWhorters into believing Trammell was working with the insurance companies

to procure annuities for them, when in fact at the time the letters were written he

had already spent all of the money they had entrusted to him. Sawyer testified

that Trammell told him to tell the McWhorters "the delay was caused by the

paperwork not all being completed for the annuity application." R. III at 110.

Moreover, both letters were sent before Trammell obtained any money from

Storey. Trammell surrendered his insurance license on June 13, 1991. If he had

not placated Oberhelman and the McWhorters throughout the spring of 1991 by continuing the impression he was working to obtain their annuities, they would have likely reported their frustrations to the insurance commission sooner. This might have prevented Storey's loss. A jury could easily conclude that by sending the letters, Trammell furthered his fraudulent scheme.

## Sufficiency of Evidence to Establish Federal Jurisdiction over Money Laundering Charges

Trammell contends his money laundering conviction should be reversed because the government failed to establish his activities affected interstate commerce. The requirement that a transaction be "in or affecting interstate commerce" is both jurisdictional and an essential element of the charge of money laundering under 18 U.S.C. § 1957. United States v. Allen, 129 F.3d 1159, 1163 (10th Cir. 1997) (petition for reh'g pending). To confer jurisdiction in federal court, the government must present a minimal amount of evidence that demonstrates the defendant engaged in a transaction involving interstate commerce. Kelley, 929 F.2d at 586. We have held this requirement is satisfied when the government presents evidence that defendant engaged in transactions involving financial institutions insured by the FDIC. See United States v. Kunzman, 54 F.3d 1522, 1527 (10th Cir. 1995). We have also held that when a defendant has money wired from one state to another, that transaction affects interstate commerce. See United States v. Lovett, 964 F.2d 1029, 1038-39 (10th

Cir. 1992).  Moreover, since the requirement that a transaction be "in or affecting interstate commerce" is an essential element of the crime, the government is required to prove to the jury that defendant's transactions actually had at least a minimal effect on interstate commerce.  Allen, 129 F.3d at 1163; see also United States v. Leslie, 103 F.3d 1093, 1101 (2d Cir.), cert. denied 117 S. Ct. 1713 (1997).

The record reveals Trammell accepted checks from financial institutions insured by the FDIC in the course of his fraudulent scheme.  The record also shows he wired money from his account in a Lawrence, Kansas, bank to a bank in Ft. Lauderdale, Florida, on June 5, 1991.  Therefore, Trammell's transactions sufficiently affected interstate commerce to confer the federal court with jurisdiction over the money laundering charges.  Moreover, the record establishes the government proved Trammell's actions had at least a minimal effect on interstate commerce.  The jury was presented with the evidence discussed above and was instructed on the government's burden to establish Trammell's transactions affected interstate commerce.  The jury's verdict indicates it found Trammell's conduct affected interstate commerce, and there is sufficient evidence in the record to support the jury's conclusion.

**Special Verdict Form**

Trammell contends his conviction should be reversed because the district court failed to use a special verdict form so the jury could identify which of the two forms of fraud identified in 18 U.S.C. §§ 1341 and 1343 served as a basis for its verdict. Trammell states he requested that the jury be asked to indicate on its verdict form for each count of mail or wire fraud whether Trammell's actions constituted a scheme to defraud or a scheme to obtain money by false pretenses, but the district court rejected the request and instructed the jury on both types of fraud. Although his argument is somewhat unclear, Trammell is apparently arguing each of the mail and wire fraud counts is duplicitous and the court was required to use a special verdict form for each count to cure the problem.

We review de novo the question of whether an indictment is duplicitous. United States v. Wiles, 102 F.3d 1043, 1061 (10th Cir. 1996). A duplicitous indictment charges the defendant with two or more separate offenses in the same count. United States v. Haddock, 956 F.2d 1534, 1546 (10th Cir. 1992). Here, Trammell is asserting each of the mail and wire fraud counts charged him with two crimes, one based upon a scheme to defraud and another based upon a scheme to obtain money by false pretenses. "The dangers of duplicity are three-fold: (1) A jury may convict a defendant without unanimously agreeing on the same offense; (2) A defendant may be prejudiced in a subsequent double jeopardy

defense; and (3) A court may have difficulty determining the admissibility of evidence." Wiles, 102 F.3d at 1061.[1]

Trammell's duplicity argument rests on the holding in United States v. Cronic, 900 F.2d 1511 (10th Cir. 1990), that "[a]lthough largely overlapping, a scheme to defraud, and a scheme to obtain money by means of false or fraudulent pretenses, representations, or promises, are *separate offenses*." Id. at 1513 (emphasis added). Relying on this statement, Trammell argues that under principles of duplicity, the government is required to charge a defendant with the two types of mail fraud in § 1341 in separate counts of an indictment.[2] Even if Trammell's indictment was duplicitous under Chronic, "[a] challenge to an indictment based on duplicity must be raised prior to trial . . . . Raising the objection at the close of the government's case is too late." United States v. Hager, 969 F.2d 883, 890 (10th Cir. 1992). However, a defendant can raise a late challenge to a duplicitous indictment "if cause is shown that might justify the granting of relief from the waiver." Id.

---

[1] The Sixth Circuit has also noted, in addition to these problems, a duplicitous indictment may give a defendant improper notice of the charges against him, prejudice the defendant in sentencing, and limit the scope of the defendant's appeal. See United States v. Blandford, 33 F.3d 685, 699 n.17 (6th Cir. 1994).

[2] Since the language of 18 U.S.C. § 1341 and 18 U.S.C. § 1343 are identical in this regard, the analysis applies to both the mail fraud and the wire fraud statutes.

The record does not reflect exactly when Trammell first advanced his argument that the jury should be instructed that the two types of mail fraud were two separate offenses. During the jury instruction hearing, Trammell's counsel stated: "I want to make sure on the record that the Court [is] aware from our *previous discussions* of our suggestion that perhaps the Cronic case and the Migliaccio case that I cited, because these are two separate and distinct offenses, that there is this duplicity problem." R. IX at 366 (emphasis added). It is not clear when Trammell's counsel and the court had "previous discussions" about the problem of duplicity. Trammell's proposed jury instructions seem to reflect an awareness of the holding in Cronic; however, the proposed instructions were filed on October 25, 1996, and trial started October 22, 1996. In addition, the docket sheet does not reflect a challenge to the indictment based on duplicity. Thus, Trammell waived his duplicity challenge by failing to object to the indictment until after trial started. Moreover, he has not presented this court with any cause to justify his failure to challenge his indictment before trial. Because he did not timely challenge his indictment on duplicity grounds, he waived any later challenge based on a failure to use a special verdict form to avoid the alleged duplicity problem.

Even if the issue were properly before us, any possible error was cured by the district court's instructions. "One cure for an otherwise duplicitous

indictment is to give an augmented instruction requiring unanimity on one or the other of the acts charged within a count that otherwise appear to constitute separate offenses." United States v. Duncan, 850 F.2d 1104, 1112 n.8 (6th Cir. 1988); see also Wiles, 102 F.3d at 1062.

The district court clearly provided a unanimity instruction:

> The government has alleged the defendant's actions constituted: (1) a scheme to defraud, and/or (2) a scheme whereby defendant attempted to obtain money by false pretenses. In order to find defendant guilty of this offense, you must find the government has proven beyond a reasonable doubt the defendant pursued either (1) a scheme to defraud, or (2) a scheme whereby defendant attempted to obtain money by false pretenses. Furthermore, should you so decide, *you must unanimously agree as to whether there was a scheme to defraud, or whether there was a scheme whereby defendant attempted to obtain money by false pretenses.*

R. I, doc. 62, instr. 15 (emphasis added). Further, when discussing the charge of wire fraud, the district court instructed the jury that "[t]he law relating to a 'scheme to defraud' and taking by 'false pretenses' was discussed in the preceding instruction." Id., instr. 16. This court has held jury instructions which are far more general than those provided here counteract problems created by a duplicitous indictment. See Haddock, 956 F.2d at 1546; see also Wiles, 102 F.3d at 1062; United States v. Sasser, 971 F.2d 470, 477-78 (10th Cir. 1992) (court refused to give specific unanimity instruction).

### Sentence Enhancement

Trammell argues the district court erred in enhancing his sentence for

abusing a position of trust because he did not occupy a "formal position of trust" and did not create an impression that he occupied such a position. This court reviews the question of whether an individual occupied a position of trust in a particular transaction for clear error. See United States v. Queen, 4 F.3d 925, 928 (10th Cir. 1993).

A defendant's sentence should be enhanced when "the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. "The primary concern of § 3B1.3 is to penalize defendants who take advantage of a position that provides them freedom to commit or conceal a difficult-to-detect wrong." United States v. Koehn, 74 F.3d 199, 201 (10th Cir. 1996). The existence of a fiduciary or personal trust relationship sometimes justifies imposition of a § 3B1.3 enhancement. See United States v. Brunson, 54 F.3d 673, 677 (10th Cir. 1995). However, "[n]ot every misuse of a fiduciary relationship will justify the enhancement under § 3B1.3. . . . To invoke § 3B1.3, the defendant must either occupy a formal position of trust or must create sufficient indicia that he occupies such a position of trust that he should be held accountable as if he did occupy such a position." Queen, 4 F.3d at 929 n.3 (citation omitted). The guideline enhancement requires more than a mere showing that the victim had confidence in defendant. Brunson, 54 F.3d at 678 (§

3B1.3 does not apply in arm's length transaction). The question of whether an individual occupied a position of trust is evaluated from the victim's perspective. Queen, 4 F.3d at 929.

As a licensed insurance agent, Trammell clearly held a "formal position of trust." See Brunson, 54 F.3d at 678 ("Unlike a personal investment advisor/investor relationship, . . . no trust relationship exists between the two principals."); Queen, 4 F.3d at 929 ("There is no question that, had the defendant actually been an investment advisor/broker as he represented to his victims, he would have occupied a position of trust."); see also United States v. Stewart, 33 F.3d 764, 770 (7th Cir. 1994) (defendant occupied position of trust within meaning of § 3B1.3 in selling annuities to senior citizens as licensed insurance broker and diverting funds for personal use); United States v. Nelson, 29 F.3d 261, 262 (7th Cir. 1994) (defendant did not even challenge court's conclusion that as an insurance broker he occupied position of trust within meaning of § 3B1.3).

Trammell used his formal position as an insurance agent to solicit funds from investors by representing he would purchase annuities for them. He then spent the funds for his own personal benefit. After he had spent the money entrusted to him, he attempted to conceal his fraud by continuing to correspond with proposed annuitants and continuing to tell the investors they would receive their annuities as soon as the paperwork was completed. Trammell's conduct

committed while acting as an insurance agent was plainly an abuse of trust by a fiduciary.  See United States v. Lowder, 5 F.3d 467, 473 (10th Cir. 1993); Queen, 4 F.3d at 928-29.  The district court properly enhanced Trammell's sentence for abusing a position of trust.

## III.

Trammell's convictions and sentence are AFFIRMED.