FILED
United States Court of Appeals
Tenth Circuit

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**April 9, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

———————————————————

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

BRYANT EDWIN SEWALL,

    Defendant - Appellant.

No. 25-1001
(D.C. No. 1:21-CR-00034-WJM-2)
(D. Colo.)

———————————————————

**ORDER AND JUDGMENT**[*]

———————————————————

Before **BACHARACH**, **McHUGH**, and **ROSSMAN**, Circuit Judges.

———————————————————

A jury convicted Appellant Bryant Edwin Sewall of fourteen counts of wire fraud and one count of conspiracy to commit wire fraud. He now appeals that conviction. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I.    BACKGROUND

In late 2015, Mr. Sewall became one of three partners in a company called Mediatrix. Beginning in March 2016, Mediatrix accepted money from clients and

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

invested it in the foreign currency exchange (forex) market.  Mr. Sewall's partners were Michael Stewart and Michael Young.  Mr. Young's primary role was marketing, *i.e.*, bringing in new investors.  Mr. Stewart's primary role was operations (*e.g.*, managing banking relationships), but he also participated to some degree in marketing.  Mr. Sewall's primary role was trading, especially through a proprietary algorithm he developed.

To actually send trades to the market, Mediatrix worked through a specialized broker named Divisa, later named Equiti.  As will become important below, Equiti would not necessarily execute every requested trade.  It imposed limits on how large of a position a client could take within a given amount of time, and it would reject trades that exceeded those limits.

Mediatrix made money by taking a percentage of the upside when it made a profitable trade.  On top of that, Messrs. Sewall, Stewart, and Young established a brokerage named Blue Isle to hold client funds, and that brokerage charged a small markup on every trade, whether winning or losing.  Messrs. Sewall, Stewart, and Young therefore profited both through Mediatrix's cut of the winning trades and Blue Isle's markups.  For purposes of this order and judgment, we will refer to Mediatrix and Blue Isle collectively as "Mediatrix."

In September 2019, the Securities and Exchange Commission (SEC) froze Mediatrix's assets on suspicion of fraud.  In February 2021, a grand jury indicted Mr. Sewall (along with Mr. Stewart) on the wire fraud and conspiracy counts previously mentioned.  In a separate action, Mr. Young pleaded guilty to one count of

lying to the SEC[1] and agreed to testify on the government's behalf in the case against Mr. Sewall and Mr. Stewart.

A jury heard Mr. Sewall's and Mr. Stewart's case in May 2024. The trial lasted twelve days and included more than thirty witnesses. The government presented evidence that Mediatrix brought in about $129 million in client funds between March 2016 and September 2019 (when the SEC shut it down). But falsehoods continually infected Mediatrix's marketing pitches and materials, particularly the claim that the trading algorithm (*i.e.*, Mr. Sewall's algorithm) had never had a losing month. In truth, Mediatrix frequently had losing months.

Mediatrix kept its losses hidden from clients because client statements only showed the profit or loss of closed trades, a.k.a. "closed P&L." The clients were not told about open trades, most of which were trending downward and would someday need to be closed at a loss unless the market happened to turn around. In other words, clients were blind to the "floating P&L," so named because the profit or loss continually changed as the market fluctuated. Such a system allows a forex trader, such as Mr. Sewall, to

> quite literally handpick . . . the winning trades that he or she would like to report to his [or her] clients. They could report, say, a profit of $5,000 in realized [*i.e.*, closed] trades. . . . [I]f a client were only told about how they did on their realized activity, they thought they would have made that money, but all the time lurking underneath could

---

[1] Mr. Young told the SEC he began raising money for Mediatrix and 2016 when he had actually begun raising money in 2015.

> be a loss of $250,000 that is floating and getting that much
> worse for their account that they would have no idea.

R. vol. VII at 2051.

Touting its record of consistently profitable *closed* trades, without disclosing outstanding liabilities, Mediatrix continually claimed to clients and prospective clients that the company had never had a losing month. This induced some prospective clients to invest, and some current clients to invest more. This was the ultimate basis for the wire fraud charges, *i.e.*, using false pretenses to induce investors to wire money to Mediatrix.

Mediatrix's system of reporting only profitable trades without disclosing floating losses led to an ever-widening gap between what clients saw when they checked their account balances and what Mediatrix could pay if clients chose to withdraw some or all of that balance. When Mediatrix shut down, clients' purported account balances added up to almost $180 million but the company had a little less than $10 million in assets, and the cumulative floating P&L was negative $33.2 million. Nonetheless, over the course of Mediatrix's existence, Messrs. Sewall, Stewart, and Young earned $24 million in performance fees—the upside percentage Mediatrix took on purportedly profitable trades—and $45 million in markup revenue.

Mr. Young testified on the government's behalf. He claimed he did not know about Mediatrix's true financial condition, but instead pitched potential investors using the information Mr. Stewart and Mr. Sewall gave to him. Mr. Stewart testified on his own behalf. He admitted Mediatrix had been a failure but claimed it was the

4

product of poor business judgment and misplaced trust, not deceit.  Mr. Sewall did not testify.

The jury convicted on all counts.  The district court later sentenced Mr. Sewall to 276 months' imprisonment and ordered him to pay more than $93 million in restitution.[2]

We will provide more details as they become relevant to Mr. Sewall's arguments, discussed below.

## II.    ANALYSIS

Mr. Sewall challenges: (i) the exclusion of certain exhibits; (ii) the sufficiency of the evidence to convict him; and (iii) the district court's decisions as to some of the jury instructions.  We will first address the sufficiency of the evidence, because that discussion provides important context for the other two issues.  We will then address the evidentiary exclusions and the jury instructions.

### A.    Sufficiency of the Evidence

Mr. Sewall's sufficiency challenge does not attack any particular count of the indictment.  Instead, he argues the evidence was insufficient as to all counts for the same reason, namely, he never intended to defraud anyone.  *Cf.* R. vol. III at 1287, 1290 (jury instructions for wire fraud and conspiracy, both requiring "specific intent to defraud").  Mr. Sewall asserts he had no meaningful contact with investors, his

---

[2] Due to unusual circumstances, Mr. Stewart's sentencing was significantly delayed.  He was scheduled to be sentenced on March 19, 2026, but did not appear.  The district court issued a bench warrant.  Mr. Young, on his lying-to-the-SEC charge, received a prison sentence of one year and one day.

role in Mediatrix was limited to trading, and he reasonably believed his trading was successful.

"We review legal sufficiency of evidence de novo, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences from the evidence in favor of the verdict." *United States v. Kaspereit*, 994 F.3d 1202, 1207 (10th Cir. 2021). "We consider all the evidence, both direct and circumstantial, but we will not weigh it or make credibility determinations." *Id.* "We will reverse and acquit only when no reasonable jury could find the defendant guilty beyond a reasonable doubt." *Id.* (internal quotation marks omitted).

Mr. Sewall claims the government's case against him included essentially no evidence he used deception to induce anyone to invest in Mediatrix. Rather, the government's theory was that (i) Mr. Sewall knew Mediatrix was not generating real profits, and (ii) Mr. Sewall knew Mr. Stewart and Mr. Young were telling people the opposite. *Cf. United States v. Trammell*, 133 F.3d 1343, 1352 (10th Cir. 1998) ("Evidence of the schemer's indifference to the truth of statements can amount to evidence of fraudulent intent." (brackets and internal quotation marks omitted)). We will discuss the two prongs of this theory in turn.

### 1.    Mr. Sewall's Knowledge of Mediatrix's Unprofitability

At the outset, we note Mr. Sewall never disputed the underlying economic reality of what happened, *i.e.*, Mediatrix raised $129 million from investors; Mr. Sewall and his partners earned tens of millions of dollars in performance fees and markup revenue; but, by the end, Mediatrix had nowhere close to the amount of

money to cover what it represented to be its clients' investment balances. A reasonable jury could therefore accept these facts as established and evaluate the rest of the evidence in that light.

We further note Mr. Sewall never argued that evidence generated toward the end of the alleged conspiracy could not be used to infer earlier knowledge. For example, he never argued that communications he generated in 2019 could only be considered, if at all, as evidence of his knowledge or state of mind in 2019. Thus, the jury was free to consider evidence from any point during the alleged conspiracy as evidence of the conspiracy and the connected wire fraud charges.

Keeping these matters in mind, the following evidence was particularly significant.

*First*, the jury saw numerous text messages between Mr. Sewall and persons at Equiti (the company that executed Mediatrix's trades), blaming Equiti's trading limits and alleged mistakes for forcing Mediatrix into a "hole" that Mr. Sewall had a plan to "dig out of . . . in time once the new money hits [*i.e.*, new investor money comes in] and [Equiti's] limits go up." R. vol. VII at 247. He complained he could not "just cut [*i.e.*, close unprofitable positions] and take a big loss or it is going to do tremendous damage to [Mediatrix's] client base." *Id.* at 280. He asked for Equiti's help to execute "a list of [profitable] trades that I can pull off and then offset the profits with [the losses on unprofitable positions] we need to reduce. This is how we reduce a lot without it impacting the clients." *Id.* at 281. He asserted that Mediatrix "took a ton of shitty positions to get under" Equiti's limits and that he would "have to

7

exit those at some point, [but] taking giant losses is not the answer." *Id.* at 283. He further described those unprofitable positions as "craters in the landscape," *id.*, and "about four holes we are in because of problems with [Equiti]," *id.* at 285.

*Second*, the jury heard phone calls between Mr. Sewall and Equiti, which Equiti recorded as part of its standard practices. In one of those calls, Mr. Sewall complained about what he viewed as Equiti's problems and stated, "We keep getting—rearranging the deck chairs on the *Titanic*, but nobody's bailing out the water." Suppl. R., Ex. 558 (audio recording) at 05:09–05:14. He told his main contact at Equiti that Equiti's "existence—and I use that term pretty specifically—is just as much on the line as ours is," *id.* at 05:47–05:58, and "if we go down, you're going with us, and we're all going to try to figure out how to not be in jail," *id.* at 07:00–07:06.

*Third*, a programmer working for Mediatrix heard Mr. Sewall talking about "the hole." R. vol. VII at 799. The programmer had access to Mediatrix's trading data and understood that "the hole" referred to "the unprofitable positions that were open." *Id.* at 800. He spoke to Mr. Sewall about this, who responded with something to the effect of, "We cannot close these positions right now. We will have to—we'll have to make money on other strategies and then slowly get out of this hole." *Id.* at 858.

*Fourth*, at closing argument, counsel for Mr. Sewall essentially conceded his client's knowledge of Mediatrix's true financial position. He stated that Mr. Sewall knew about "open negative trade equity," R. vol. VII at 2844, or in other words,

8

negative floating P&L, but Mr. Sewall "was consistently working to get the trading back in line so that he could fix that," *id.*, and "it is not fraud for those open positions to not be successful at that time," *id.* at 2845–46. Counsel further stated that Mr. Sewall "believed that if he was able to work out those problems that Equiti was causing, that in due time, those investments would recover, would turn themselves around, and assuming a normal rate of people asking to redeem their accounts, they would have never had to say no to anybody." *Id.* at 2846.

In short, a reasonable jury had more than enough from which to conclude Mr. Sewall knew that Mediatrix was not trading profitably.

2.  <u>Mr. Sewall's Knowledge that His Partners Were Giving False Information to Investors About Mediatrix's Profitability</u>

Mr. Sewall does not dispute that his partners, and particularly Mr. Young (the chief salesman), gave clients and prospective clients false information about Mediatrix's profitability. He only disputes his knowledge that they were doing so. The jury, however, heard evidence of the opposite.

*First*, Mr. Sewall is incorrect to claim that the government had no evidence he personally used Mediatrix's alleged track record to solicit investment. One witness (a fellow Marine named Patrick Parham) testified Mr. Sewall convinced him to invest in part because of Mr. Sewall's claim that Mediatrix never had a losing month. The jury could reasonably infer that if Mr. Sewall himself was making such representations, he knew his partners were as well.

9

*Second*, Mr. Young and an investor named Scott Burg testified that Mr. Sewall was present on conference calls with prospective investors where Mediatrix's allegedly unbroken profitability record was discussed. Mediatrix's compliance officer, Brian King, testified that Mr. Sewall was present at meetings with potential clients in New York City where Mediatrix was described as having a positive track record. And Mediatrix's biggest investor, Sebastiano Cossia Castiglioni, testified about a dinner he had with all three Mediatrix partners. Not only was Mediatrix's alleged track record touted during that dinner, but Mr. Sewall actively participated in the conversation by describing his allegedly careful trading strategy.

*Third*, the jury saw e-mails and text messages between Mr. Sewall and Mr. Young in which Mr. Sewall emphasized Mediatrix's profitability and encouraged Mr. Young to do the same when talking to prospective investors. For example, on one occasion, Mr. Young sent an e-mail to Mr. Sewall and Mr. Stewart with marketing language about Mediatrix's handling of a negative market event (not otherwise described in the record). That language included statements that Mediatrix "came away unscathed" through "[p]rudent trading principles" which "are what has gotten us to 31 straight months of gains." R. vol. VII at 773. Mr. Sewall replied that the language was "an excellent explanation." *Id.*

On a later occasion, a prospective investor asked Mr. Young about the fact that Mr. Stewart had, in the 1990s, been sanctioned by the Commodity Futures Trading Commission for falsely representing his forex trading success to solicit customers for a forex trading class. Mr. Young asked Mr. Sewall how he should respond to the

10

prospective investor.  Mr. Sewall replied that Mr. Young should emphasize Mediatrix's "spectacular three-year track record with not one losing month.  That is unheard of, so that should balance out a lot of those other things, because people are greedy, and if you put up those numbers, well, we are where we are because of it." R. vol. VII at 1459.

On a yet later occasion, Mr. Young relayed to Mr. Sewall potential clients' concerns that Mediatrix's record was too good to be true.  Specifically, Mr. Young said, "The probability in a high leverage space to never lose is statistically very hard to do."  *Id.* at 1709.  Mr. Sewall responded, "Someone has to be the first in everything.  Maybe we are.  That doesn't make it fraud."  *Id.*

*Fourth*, Mr. Young regularly copied Mr. Sewall on other marketing materials making similar claims about Mediatrix's unbroken profitability record.

Thus, considering that a reasonable jury could conclude Mr. Sewall knew Mediatrix was not a profitable firm, the foregoing evidence could lead a reasonable jury to conclude Mr. Sewall knew that clients were being solicited through false information.

### 3.    Mr. Sewall's Counterarguments

Mr. Sewall offers several reasons why, in his view, the jury could not conclude he participated in the fraud.  None are persuasive.

First, Mr. Sewall emphasizes testimony from certain investors that they never communicated with Mr. Sewall or that Mr. Sewall was not present at important meetings.  The jury, however, heard evidence that Mr. Sewall was present at other

11

meetings (or on conference calls) where Mediatrix's false track record was discussed. And he actively promoted the success of his trading strategy at the dinner with Mr. Cossia Castiglioni.

Second, Mr. Sewall notes evidence that he was usually physically separated from the other partners because he performed his trading from the Bahamas and the others were generally somewhere else in the world. He also emphasizes that each of the partners had distinct, separate roles. But the weight to give to these considerations was for the jury to decide.

Third, there was evidence that Mediatrix's positive results were verified by a third-party website called Myfxbook. Mr. Sewall argues he could reasonably rely on that to assure himself that his trading strategy worked. But this argument runs into numerous problems. To begin, the evidence showed Myfxbook did not independently gather data but relied entirely on data sent to it by forex trading companies. A forex trading company could connect any of its trading accounts to Myfxbook, including client subaccounts (which, in Mediatrix's case, did not disclose floating liabilities) or even practice accounts (where trades are purely simulated). Finally, as already described, the jury read and heard Mr. Sewall's own words about Mediatrix's enormous trading liabilities. It was up to the jury to decide what to believe, if anything, about the Myfxbook evidence.

Fourth, there was expert testimony that closed P&L is a common and legitimate accounting method in the forex world. But the government did not argue that closed P&L is inherently fraudulent. Rather, the government argued that

Mediatrix used closed P&L to make itself look profitable regardless of its real financial state.

Finally, Mr. Sewall claims "[t]he Government's case hinged almost exclusively on the testimony of Michael Young," who "had every incentive to minimize his own culpability and shift responsibility onto Sewall." Aplt. Opening Br. at 40. But the jury was aware of Mr. Young's plea deal and his potential conflict of interest. Regardless, the government's case against Mr. Sewall did not hinge on Mr. Young's testimony. Many witnesses offered testimony relevant to Mr. Sewall's state of mind, as already described. And much of Mr. Young's importance from the government's perspective was as a means to introduce Mr. Sewall's own words through text messages and e-mails exchanged between the two of them.

Moreover, through other witnesses, the government introduced evidence suggesting Mr. Young truly did not know Mediatrix's real financial condition. A witness from Equiti testified that Mr. Stewart instructed Equiti not to communicate with Mr. Young. The government introduced a message from Mr. Stewart telling his Equiti contact that Mr. Young "hasn't a clue of what goes on with the brokerage side of [the business] and how it works," so Equiti should not meet with Mr. Young, despite Mr. Young's desire to do so on an upcoming trip to London, where Equiti was headquartered. R. vol. VII at 233. The government also introduced text messages between Mr. Sewall and Mr. Stewart stating that Mr. Young should not meet with Equiti because "we don't need him poking around in [operations]. . . . He is the marketing guy and needs to stay in that realm and exercise client management." *Id.*

13

at 766.  Patrick Parham (the Marine whom Mr. Sewall convinced to invest) testified that he eventually went to work for Mediatrix as an accountant, and Mr. Stewart told him never to give financial statements to Mr. Young—a position Mr. Sewall reaffirmed.  And a programmer hired by Mediatrix testified he overheard Mr. Sewall and Mr. Stewart remarking that Mr. Young "likes to know everything about everything" and "asks too many questions."  *Id.* at 811.

In short, Mr. Sewall's counterarguments, together or in isolation, do not demonstrate that a reasonable jury could have voted only to acquit him.

\* \* \*

We conclude the evidence was sufficient to convict Mr. Sewall.

**B.    Evidentiary Rulings**

With this context, we now turn to Mr. Sewall's attack on two evidentiary rulings, specifically, the exclusion of his Exhibits A60 and A61.

1.    Additional Background

a.    *The Flash Crash and the Grant Thornton Report*

On October 9, 2016, the British pound suddenly and rapidly dropped in value compared to other currencies, creating what is known in the forex industry as a "flash crash."  R. vol. VII at 211, 1569.  This caused about thirty open Mediatrix trades to execute at the wrong price.  Equiti therefore adjusted the affected trade prices to compensate for the crash, and communicated as much to Mediatrix.  Equiti also temporarily credited $100,000 to Mediatrix's trading account, giving it more margin

and therefore more ability to trade. This credit was neither a loan nor a reimbursement.

Later, Mediatrix hired the accounting firm Grant Thornton to produce a report verifying Mediatrix's success, which could then be used as a marketing tool. But Mediatrix sent Grant Thornton only client subaccount information, and client subaccount information only showed the closed P&L. Grant Thornton therefore received no information about "whether or not [Mediatrix] had enough assets to cover its balances." *Id.* at 223. Also, the final report, issued in 2018, stated that Equiti "reimbursed all client accounts that experienced losses during [the October 2016 flash crash]." *Id.* at 1969. The parties do not point us to anywhere in the record explaining how Grant Thornton came to believe that Equiti provided reimbursement. As described above, this was not an accurate description of what Equiti had actually done. In any event, Mr. Young relied on the Grant Thornton report as part of his marketing efforts.

b.    *Disputes Regarding the Grant Thornton Report at Trial*

During cross-examination of Mr. Young at trial, Mr. Sewall's attorney sought to admit the Grant Thornton report into evidence. The government objected that the report was hearsay. Mr. Sewall's attorney argued, however, that she was not offering the report for its truth, but for its effect on Mr. Young, given that he used it in marketing efforts. The district court overruled the government's objection and admitted the report because "[t]his exhibit was relied upon by this witness in his marketing efforts." R. vol. VII at 1964.

15

Later, during Mr. Sewall's defense case, Mr. Sewall called Cliff Porter, a forensic accountant, as a fact witness (not an expert). Mr. Porter had taken the voluminous accounting data attached to the Grant Thornton report and condensed it into two single-page summary exhibits labeled A60 and A61. *See* Fed. R. Evid. 1006(a) (allowing summary exhibits "offered to prove the content of voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court"). Both exhibits were intended to show that, factoring in the flash-crash reimbursement Grant Thornton incorrectly reported, Mediatrix's financials mostly showed winning months. Mr. Porter calculated the reimbursement (which, again, never truly happened) at about $5.1 million.

Counsel for Mr. Sewall first attempted to introduce Exhibit A61 by arguing that a Rule 1006 summary exhibit could be used for any purpose, even if the underlying data was admitted for a limited purpose (in this case, its effect on Mr. Young). The government disagreed and the district court was persuaded by the government's position. Counsel then pushed back that he could admit Exhibit A61 for its effect on the listener, "and the listener in this case will be Mr. Sewall." R. vol. VII at 3311. The district court excluded the document as an improper attempt to evade the hearsay rules. It did not comment on Mr. Sewall's effect-on-the-lister argument but gave counsel "a final opportunity to make an offer of proof." *Id.* at 3313. Counsel did not do so.

Not long after, counsel attempted to introduce Exhibit A60. The government objected that the exhibit's calculations regarding the flash crash were based on

16

opinion testimony about the underlying events that could only be offered by an expert. Mr. Sewall's counsel responded that the exhibit was important to support Mr. Sewall's expected testimony: "Mr. Sewall is going to testify that Mr. Stewart told him that after the flash crash in October 2016, that all of the accounts were restored to their preflash crash balances. Mr. Sewall relied on that information. He believed it was true." *Id.* at 3325–26. The district court agreed with the government, however, that Exhibit A60 included impermissible expert testimony, and therefore excluded it.

### 2. Harmless Error

The parties dispute: (i) whether Rule 1006 exhibits may be admitted for their truth even if the underlying data was admitted for a limited purpose; (ii) whether a Rule 1006 exhibit—one that, essentially by definition, did not exist until trial preparation—may be admitted to show the "effect on the listener" of the underlying data; (iii) whether such an exhibit may be offered by a fact witness other than the person claiming to have been affected by the information (in this case, Mr. Porter offering the exhibit for its effect on Mr. Sewall); and (iv) what sort of efforts going into the creation of a Rule 1006 exhibit take it beyond a mere "summary, chart, or calculation," Fed. R. Evid. 1006(a), and into the realm of expert opinion. We conclude we need not resolve any of these disputes because we would affirm regardless.

"If a party objects to a district court's evidentiary ruling based solely on the Federal Rules of Evidence, we review for nonconstitutional harmless error." *United*

*States v. Walker*, 85 F.4th 973, 982 (10th Cir. 2023) (brackets and internal quotation marks omitted).[3]  Reversible error exists in this context "only if the error affects a substantial right of the party . . . ."  Fed. R. Evid. 103(a); *see also* Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.").  "[A]n error affecting a substantial right of a party is an error which had a substantial influence on the outcome or which leaves one in grave doubt as to whether it had such effect."  *United States v. Charley*, 189 F.3d 1251, 1270 (10th Cir. 1999) (brackets and internal quotation marks omitted).  "If, when all is said and done, [the appellate court] is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand . . . ."  *Kotteakos v. United States*, 328 U.S. 750, 764 (1946).  "The government bears the

---

[3] Mr. Sewall also claims the exclusion of Exhibits A60 and A61 violated his constitutional right to present a complete defense.  As the government points out, however, he never argued this theory to the district court.  In reply, Mr. Sewall argues that his evidentiary objections were enough to preserve the constitutional issue, and he does not argue for plain error.  Mr. Sewall cites no authority that arguments over admissibility under the Rules of Evidence are enough to preserve a constitutional complete-defense argument.  The authorities we have found are to the contrary.  *See United States v. Thurber*, 106 F.4th 814, 830 (8th Cir. 2024) (stating that the court would review the defendant's constitutional complete-defense argument only for plain error because, in the district court, the defendant had never claimed exclusion of the evidence in question would violate his constitutional rights), *cert. denied*, 145 S. Ct. 1071 (2025); *see also United States v. Coulter*, 57 F.4th 1168, 1182 (10th Cir. 2023) (holding that objections to testimony based on hearsay and lack of personal knowledge are not enough to preserve a Confrontation Clause challenge, except under plain error).  We therefore conclude Mr. Sewall forfeited this argument in the district court.  Moreover, his refusal to argue for plain error on appeal means he waives the issue.  *See id.* ("Because [the defendant] fails to argue for plain error in his opening brief or discuss the elements of the standard in his reply brief, he has waived the issue.").

burden of showing the error was harmless by a preponderance of the evidence."

*United States v. Jean-Pierre*, 1 F.4th 836, 843 (10th Cir. 2021).

Assuming for argument's sake the district court erred in excluding either or both of Exhibits A60 and A61, the government claims the error was harmless. We conclude the government has carried its burden on this issue.

"The exclusion of evidence is harmless when the substance of the excluded evidence comes before the court through other means." *United States v. Gould*, 672 F.3d 930, 942 (10th Cir. 2012). Here, the data underlying the Grant Thornton report was voluminous, but it was in the record. In closing arguments, Mr. Sewall's attorney specifically directed the jury to it: "[T]he Grant Thornton report that is in evidence . . . explains what Mr. Sewall would have believed about how those trades were treated that month [of the flash crash], and you can refer to that." R. vol. VII at 2843. In addition, the court allowed Mr. Porter to testify from his review of the documents that, "[w]ith the exception of October 2016 [the flash-crash month] and then, again, April of 2019, . . . the monthly total of closed trades P&L from all of those master accounts [was] positive." *Id.* at 3316. And the court admitted a line graph created by Mr. Porter showing closed-trade profits always rising month-to-month, save for the two exceptions noted. In other words, to the extent *closed* P&L profitability mattered, Mr. Porter presented the jury with reason to believe that Mediatrix's record was nearly unbroken. Finally, Mr. Young and Mr. Stewart both testified they thought Equiti had reimbursed Mediatrix after the flash crash. Mr. Young even said he had discussed the alleged reimbursement with Mr. Sewall.

19

Mr. Sewall's theory that he reasonably believed Mediatrix was consistently profitable was therefore before the jury.

We also agree that evidence of Mr. Sewall's state of mind—the only element he contests—was overwhelmingly against him. *See Jean-Pierre*, 1 F.4th at 843 ("Often, the government [meets its burden to show harmless error] by demonstrating the evidence of guilt is overwhelming." (internal quotation marks omitted)). Mr. Sewall's own words are his worst enemy here. It is plain he knew Mediatrix was unprofitable and that he and his colleagues were representing otherwise. His lawyer's representation at closing argument that Mr. Sewall simply needed help from Equiti and time to dig out of the hole (without too many client withdrawals) could not change the result. "[E]ven though a defendant may firmly believe in his plan, his belief will not justify baseless or reckless representations." *United States v. Themy*, 624 F.2d 963, 965 (10th Cir. 1980).

Finally, we agree with the government that the "effect on the listener" theory Mr. Sewall offered as a basis for introduction of Exhibits A60 and A61 is inherently incredible. Mr. Sewall wanted the jury to believe he learned from Grant Thornton in 2018 that, back in 2016, Equiti had made a $5.1 million reimbursement into Mediatrix's trading account. Mr. Sewall was one of three partners at Mediatrix and, even more importantly, he was in charge of trading. The notion that a person in Mr. Sewall's position would be unaware of such a deposit for two years is untenable.

For all these reasons, we conclude the district court's alleged error in excluding Exhibits A60 and A61 was harmless.

### C.    Jury Instructions

Finally, we turn to Mr. Sewall's claim that the district court erred with respect to the jury instructions.

#### 1.    Separate Good Faith Instruction

Mr. Sewall asked the district court to include a jury instruction specifically about the effect of good faith.  The proposed instruction stated, in relevant part, "'Good faith' is a complete defense to a charge that requires intent to defraud.  A defendant isn't required to prove good faith.  The Government must prove intent to defraud beyond a reasonable doubt."  R. vol. III at 565.

The district court did not explain why it rejected this instruction.  Regardless, "we review a district court judge's refusal to give a requested instruction under this standard for an abuse of discretion."  *United States v. Bowling*, 619 F.3d 1175, 1184 (10th Cir. 2010).  And "a separate good faith instruction is [not] necessary where a district court properly instructs the jury on the element of intent, because a finding of the intent to defraud necessarily implies that there was no good faith."  *Id.* at 1183 (internal quotation marks omitted).  Here, the district court instructed the jury that, to return a verdict of guilty on the wire fraud charges, the jury "must be convinced that the government has proved . . . beyond a reasonable doubt," among other things, that "the defendants acted with specific intent to defraud."  R. vol. III at 1287.  The district court gave the same instruction as to the conspiracy charge.  *See id.* at 1290.  In this light, Mr. Sewall's proposed instruction "would simply [have] give[n] the jury

21

a clearer understanding of the issues." *Bowling*, 619 F.3d at 1184 (internal quotation marks omitted), which is not required. There was no abuse of discretion.

### 2.    Definition of Intent to Defraud

Mr. Sewall also proposed that the jury instructions define "intent to defraud" as "an intent to deceive and cheat someone." R. vol. III at 561, 563. As support, Mr. Sewall cited decisions from the Fifth, Ninth, and Eleventh Circuits emphasizing the need to deceive *and* cheat, rather than deceive *or* cheat. The government did not object to the overall point—*i.e.*, there must be both intent to deceive and intent to cheat—but objected that Mr. Sewall's specific phrasing "could [lead] the jury to believe that you have to 'cheat and deceive' the same person." R. vol. VII at 2752. The government worried about this implication because much of its case relied on proving Mr. Sewall and Mr. Stewart deceived Mr. Young, with the purpose of Mr. Young (unwittingly) cheating investors out of their money. The government therefore proposed "an intent to cheat someone out of money or property by means of deception." R. vol. III at 139.

The district court's first proposed set of jury instructions adopted the government's definition. At the jury instruction conference, Mr. Sewall's attorney objected based on Mr. Sewall's earlier submission, and further stated, "I think that would be fine if we can add 'means an intent to deceive and cheat.'" R. vol. VII at 2750. In other words, an instruction that would read "an intent to deceive and cheat someone out of money or property by means of deception." Mr. Sewall's attorney continued, "And I think that is almost inherently implied by the Court's instruction.

22

I prefer the language of our instruction, I think it is a bit more simplistic." *Id.*  The

district court agreed with the government's argument, however, about the need to

decouple the person being deceived from the person being cheated, so the court

retained the government's proposal, and that is what went to the jury.

"We review the jury instructions de novo and view them in the context of the

entire trial to determine if they accurately state the governing law and provide the

jury with an accurate understanding of the relevant legal standards and factual issues

in the case." *United States v. Thomas*, 749 F.3d 1302, 1312 (10th Cir. 2014) (internal

quotation marks omitted).  But we review for abuse of discretion the district court's

"shaping or phrasing [of] a particular jury instruction." *Id.* at 1312–13 (internal

quotation marks omitted).

Mr. Sewall says that "by redefining 'intent to defraud' in a manner contrary to

the weight of authority [referring to the extra-circuit cases he cited], the court

lowered the Government's burden of proof." Aplt. Opening Br. at 46–47.  Mr. Sewall

continues that "the court stripped the jury of the framework to evaluate [his] actual

defense—that he reasonably believed the trading was legitimate—and at the same

time expanded the pathway to conviction." *Id.* at 47.

We see no error.  Mr. Sewall and the government both wanted to rule out the

possibility of the jury treating intent to deceive and intent to cheat as separate prongs,

either one of which could satisfy the intent element.  Both proposed instructions

would have served that purpose.  Mr. Sewall's proposal was simpler, as his counsel

stated to the district court, but that merely goes to shaping or phrasing—a matter within the district court's discretion, *see Thomas*, 749 F.3d at 1312–13.

Moreover, the district court gave a reason for choosing the government's version, namely, the need to avoid an implication that a wire-fraud defendant needs to deceive and cheat the same person.  Mr. Sewall nowhere argues that this is an incorrect interpretation of the wire-fraud statute.  Even if it were incorrect, nothing about his good-faith theory turned on the ability to parse the connection between deception and cheating.  He merely intended to argue (and did argue) that he genuinely believed he was operating a legitimate, successful trading program.  Thus, his good-faith theory remained completely intact even under the government's definition of intent to defraud.  For these reasons we affirm the district court's jury instruction on this issue.[4]

## III.    CONCLUSION

We affirm the district court's judgment.

Entered for the Court

Carolyn B. McHugh
Circuit Judge

---

[4] Mr. Sewall further argues that the rejection of his good-faith instruction and the adoption of the government's intent definition are "connected errors," Aplt. Opening Br. at 46, that doomed his good-faith theory.  As we have already explained, neither of the district court's decisions prevented him from presenting his theory to the jury.